IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

UNITED STATES OF AMERICA, *ex*
*rel.* REBECCA HOCKADAY, and
STATE OF GEORGIA, *ex rel.*
REBECCA HOCKADAY,

    Plaintiff-Relator,

vs.

ATHENS ORTHOPEDIC CLINIC, P.A.,
*et al.*,

    Defendants.

\*
\*
\*
\*
\*
\*
\*
\*

CASE NO. 3:15-CV-122 (CDL)

<u>O R D E R</u>

After prolonged discovery, multiple acrimonious disputes, and the intrusion of Covid-19, this False Claims Act case has finally reached the point where the Court must decide which of Relator's numerous claims shall proceed to trial. Although Relator believes she has voluntarily narrowed her claims, the scattered and often disorganized briefing on the pending summary judgment motions belies any such contention. The Court has attempted to approach the motions methodically, and as to the claims that remain for trial, encourages the parties to do the same in their trial preparation lest a jury empaneled to try this case on Halloween, as presently scheduled, may not complete its work by New Year's Day.

The chief protagonist in this drama is Rebecca Hockaday, a disgruntled former employee of the Athens Orthopedic Clinic, P.A. ("AOC"). During part of the relevant time frame, she served as AOC's chief operating officer. After her employment was terminated, she found a lawyer who filed this qui tam action pursuant to the False Claims Act ("FCA"). She claims that AOC, several related entities, and individual physicians within the medical practice submitted false claims for reimbursement to the Centers for Medicare and Medicaid Services. She alleges thirty-one categories of FCA violations. She also contends that Defendants retaliated against her for trying to stop FCA violations. Pending before the Court are several summary judgment and related motions filed by Defendants and Relator. For the reasons explained in the remainder of this Order, Defendants' summary judgment motion on Relator's Stark Law claims (ECF No. 346) is denied, while Defendants' other summary judgment motions (ECF Nos. 341, 342, 343, 345, 347, 348) are granted in part and denied in part. Relator's summary judgment motion on Defendants' advice-of-counsel defense (ECF No. 340) is granted in part and denied in part. Defendants' motion to exclude the testimony of Harold Pellerite (ECF No. 349) is granted to the extent set forth in this Order. Defendants' motion to strike declarations (ECF No. 416) is denied.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   A fact is *material* if it is relevant or necessary to the outcome of the suit.   *Id.* at 248.   A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.   *Id.*

DISCUSSION

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B).[1]   The FCA "is designed to protect the Government from fraud by

---

[1] Relator also asserts claims under the Georgia False Medicaid Claims Act, which mirrors the language of the federal False Claims Act; Georgia courts "generally look to federal case law to decide issues under" the Georgia False Medicaid Claims Act. *Murray v. Cmty. Health Sys. Pro. Corp.*, 811 S.E.2d 531, 537 (Ga. Ct. App. 2018).   For the sake of simplicity, the Court refers to all of the claims based on false certifications or improper billing as "FCA claims."

imposing civil liability and penalties upon those who seek federal funds under false pretenses." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1103 (11th Cir. 2020) (quoting *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014)). "Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Id.* (quoting *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015)).

Relator contends that when Defendants submitted claims to Medicare and Medicaid, they falsely certified compliance with certain laws and regulations. To establish an FCA claim under a false certification theory, a relator must prove: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021) (quoting *Urquilla-Diaz*, 780 F.3d at 1045).

Relator initially asserted claims based on fifty-four categories of alleged FCA violations, plus an FCA retaliation claim. After Defendants filed their summary judgment motions on all the claims, Relator moved to dismiss her claims based on twenty-three categories of FCA violations, and the Court

dismissed those claims.   Order Dismissing Claims, ECF No. 380.[2]
The dismissal of those claims did not completely moot any of the
summary judgment motions, and the Court addresses the remaining
claims below.   But before focusing on the specific claims, the
Court finds it helpful to address three preliminary matters that
affect some or all of Defendants' pending motions.

## I.   Preliminary Matters

### A.   Identification of Specific Claims for Reimbursement

In most of their summary judgment motions, Defendants argue
that Relator cannot identify a claim that was submitted to a
Government healthcare program and thus cannot establish an FCA
claim.   Federal Rule of Civil Procedure 56 permits a movant who
does not have a trial burden of production to assert, without
citing the record, that the nonmoving party "cannot produce
admissible evidence to support" a material fact.   Fed. R. Civ.
P. 56(c)(1)(B); *accord* Fed. R. Civ. P. 56 advisory committee's
note to 2010 amend. ("Subdivision (c)(1)(B) recognizes that a

---

[2] The dismissed claims are: Claim # 26 (AKS Gifts/Trips/Remuneration);
Claim # 30 (Stark Oral Leases); Claim # 32 (Modifier 24 Misuse); Claim
# 33 (Modifier 57 Misuse); Claim # 34 (Modifier 58 Misuse); Claim # 37
(Unbundling Fluoro); Claim # 38 (DME-ASC Unbundling); Claim # 39
(ASC/LASC Director Bonus Kickbacks); Claim # 40 (Above Fair Market
Value Lease MRI Snellville); Claim # 41 (Orthotics-Falsifying ICDs);
Claim # 42 (PT/OT-False Certifications); Claim # 43 (PT/OT-Upcoding);
Claim # 44 (PT/OT-Supervision/Incident To); Claim # 45 (Above FMV
Lease-POA); Claim # 46 (AKS-Kickbacks from Third Party Companies to
Spouses); Claim # 47 (AKS-Makoplasty); Claim # 48 (Orthotics-Medical
Necessity/Overutilization); Claim # 49 (Orthotics-Upcoding); Claim #
50 (DME-Upcoding); Claim # 51 (PT/OT-Medical Necessity); Claim # 52
(AKS-Administrative Salary and Bonuses); Claim # 53 (DME-Refund);
Claim # 54 (Ultrasound Licensure/Certification).

party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

Relator responds to most of Defendants' arguments on this issue by pointing to unauthenticated charts without any explanation from a witness about who created the charts, where the data came from, or what the charts mean. Relator argues that these charts establish that the relevant claims were submitted to the Government for payment and were paid. At trial, these unauthenticated charts standing alone will likely be insufficient to support this contention by Relator. But at this stage of the proceedings, it does not appear that Defendants maintain that the claims information *cannot* be presented in an admissible form. Although Relator has not explained how she plans to reduce the exhibits to admissible form at trial, the Court finds it hard to believe that competent lawyers will be unable to do so given that there is no serious dispute that AOC treated Medicare and Medicaid patients and billed government healthcare programs for its services. For summary judgment purposes, the Court declines to issue a blanket ruling that Relator has failed to present evidence that Defendants submitted claims to the Government for services

rendered to their patients who were covered by Medicare and/or Medicaid.

B.   Defendants' Reliance on Advice of Counsel

Defendants contend that Relator cannot establish the scienter element of some of her claims because Defendants relied on the advice of counsel in deciding how to proceed with the relevant transactions.  Under the FCA, reckless disregard "is the lowest scienter threshold." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1303 (11th Cir. 2021)*.*  There is no dispute that a participant in the Medicare and Medicaid programs has "a duty to familiarize itself with the legal requirements for cost reimbursement." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 64 (1984).  Congress added the reckless disregard rule "to capture 'the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.'"  *Yates*, 21 F.4th at 1303 (quoting *Urquilla-Diaz*, 780 F.3d at 1058).

A "person acts with reckless disregard—and thus 'knowingly'—under the FCA when he 'knows or has reason to know of facts that would lead a reasonable person to realize that harm [like a false claim] is the likely result of the relevant act.'"  *Id.* (quoting *Urquilla-Diaz*, 780 F.3d at 1058).  Good faith reliance on counsel's advice, though, can negate the mens

rea element.  *United States v. Vernon*, 723 F.3d 1234, 1269 (11th Cir. 2013) (alteration in original) (quoting *United States v. Petrie*, 302 F.3d 1280, 1287 n.6 (11th Cir. 2002)).  The elements of this defense are: "(1) [the defendant] fully disclosed to his attorney all material facts that are relevant to the advice for which he consulted the attorney; and (2) thereafter, he relied in good faith on the advice given by his attorney."  *Id.* (alteration in original) (quoting *United States v. Hill*, 643 F.3d 807, 851 (11th Cir. 2011)).

Relator argues that Defendants should not be permitted to assert the advice-of-counsel defense.  Relator emphasizes that the Eleventh Circuit refers to the advice-of-counsel defense as an "affirmative defense" in several contexts, including the context of a health fraud criminal case.  *See Vernon*, 723 F.3d at 1269 ("Because good faith reliance [on advice of counsel] is an affirmative defense, a defendant bears the burden of proof on the issue.").  The Court understands that Defendants did not formally raise the advice-of-counsel defense until May of 2021, more than two years into the discovery period, after withholding communications between Defendants and their attorneys based on attorney-client privilege.  The Court permitted Defendants to maintain the advice-of-counsel defense on the claims for which Defendants agreed to waive attorney-client privilege.  The Court concluded that Relator would not be prejudiced by the late

assertion of the defense because Relator was given ample opportunity to explore the advice of counsel defense during discovery. *United States ex rel. Hockaday v. Athens Orthopedic Clinic, P.A.*, No. 3:15-CV-122 (CDL), 2021 WL 5015616, at *2 (M.D. Ga. Oct. 27, 2021). The Court finds no reason to reconsider that decision. Defendants will be permitted to rely on the advice-of-counsel defense if they present sufficient evidence that it applies.

Relator argues that even if Defendants are permitted to raise the defense, they did not point to enough evidence to create a genuine fact dispute on the issue, and Relator seeks summary judgment on the defense. In general, the question whether "a defendant properly disclosed all relevant facts to the expert, concealed information, or relied in good faith on his advisor are determinations that the jury must make under proper instruction." *S.E.C. v. Bankatlantic Bancorp, Inc.*, 661 F. App'x 629, 637 (11th Cir. 2016) (finding that the district court erred in granting summary judgment against the defendants on their reliance-on-professional-advice-defense because genuine fact disputes existed on whether the defendant provided all relevant facts to its advisor and followed the advisor's advice). The Court addresses the specific objections to the application of this defense in the parts of this Order discussing the separate claims against which it is asserted.

C.   Defendants' Motion to Strike Declarations

The Court previously ruled that Relator had to produce declarations sworn by nonparty witnesses.  Hr'g Tr. 213:18-214:5 (May 26, 2021), ECF No. 296.  The Court clarified that the ruling "was intended to require production of only those declarations that Relator's counsel relied upon during depositions to establish a foundation for his questions."  Text Order (May 27, 2021), ECF No. 291.  The Court found that Relator waived any work product privilege in such declarations once she decided to rely on them in this litigation.

Defendants assert that Relator failed to produce twelve declarations required to be produced by this ruling, and they ask that the Court strike the declarations as a sanction.  In support of this argument, Defendants point out that Relator's counsel asked questions related to topics covered by the declarations during several depositions.  But Defendants did not point to any evidence that Relator *relied on* the declarations *to establish a foundation for his questions*.  There is no suggestion that Relator referred to the declarations in any way during the depositions.  And, Defendants do not assert that Relator failed to disclose the declarants as potential witnesses during discovery.  Rule 37 sanctions are not warranted under these circumstances, and Defendants' motion to strike (ECF No. 416) is denied.

## II.  Defendants' Summary Judgment Motion – Anti-Kickback Statute Claims (ECF No. 343)

Most of Relator's claims are based on alleged violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  Relator asserts that when Defendants submitted claims for Medicare and Medicaid reimbursement, they falsely certified that they had complied with the Anti-Kickback Statute.  The Anti-Kickback Statute prohibits "knowingly and willfully" soliciting, receiving, offering, or paying "remuneration" in return for the referral of any patient whose care is paid for by a federal health program or for purchasing or in return for recommending items (like medical devices) for which payment may be made under a federal healthcare program.  *Id.*[3]  A claim for payment that includes items or services resulting from a violation of the Anti-Kickback Statute "constitutes a false or fraudulent claim for purposes of" the FCA.  *Id.* § 1320a-7b(g).[4]

---

[3] The Anti-Kickback Statute does not define "remuneration," except to say that it includes "any kickback, bribe, or rebate."  42 U.S.C. § 1320a-7b(b)(1).  There is no dispute that quid pro quo kickbacks and overpayment-for-services arrangements are illegal if they are to induce referrals.  Relator contends that "remuneration" also exists under other circumstances, but the Court finds it unnecessary to reach that issue.

[4] Defendants summarily argue that claims resulting from a violation of the Anti-Kickback Statute are not false claims under the Georgia Medicaid False Claims Act.  The Court previously noted that when a provider enters an agreement to provide services to Georgia Medicaid patients, it agrees to comply with Georgia Medicaid's conditions. *United States ex rel. Williams v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-130 (CDL), 2014 WL 2866250, at *15 (M.D. Ga. June 24, 2014). One of those conditions prohibits the offer or payment of remuneration in return for referral of Medicaid patients.  *Id.* (citing Ga. Dep't of Cmty. Health Div. of Medicaid, Policies & Procedures for

Relator identifies seventeen types of Anti-Kickback violations that led to false claims. They fall into two general categories: (1) remuneration in the form of compensation, bonuses, and buy-in packages to AOC physicians and physician assistants in exchange for referrals to AOC-affiliated surgery centers and ancillary services; and (2) remuneration in the form of payments and discounts to AOC and its physicians in exchange for referrals of products and services from other companies. Defendants' summary judgment motion does not make arguments specific to each claim category, but Defendants do generally argue that Relator cannot establish the requisite elements for any of the claims. Each side submitted extensive fact statements related to the Anti-Kickback Statute claims, and the Court will analyze the claims in the context of these facts.[5]

---

Medicaid/PeachCare for Kids § 106(E)). Another condition prohibits billing for services not performed in accordance with all applicable policies. *Id.* (citing Ga. Medicaid Policies & Procedures § 106(J)). Thus, "compliance with anti-kickback rules was a condition of payment for Georgia Medicaid claims." *Id.* The Georgia Medicaid False Claims Act prohibits presentment of a "false or fraudulent claim for payment" to Georgia Medicaid. O.C.G.A. § 49-4-168.1(a)(1). The Court finds that a bill to a government program is a false or fraudulent claim if it seeks funds for a service or item that is tainted by an illegal kickback.

[5] The quality of the factual statements accompanying the briefing of these issues is disappointing. Relator's counterstatement of facts is especially unorganized and confusing, and it appears to contain numerous facts that are unrelated to the Anti-Kickback Statute claims. The Court spent considerable time reviewing the fact statements and record citations to try and figure out what the parties say happened. Effective written advocacy should make the judge's job easier, not more complicated.

A.    Physician Buy-Ins (Claims # 2, #5, # 15, # 23)

AOC is owned by physician partners.  To become a partner, a physician must purchase an ownership interest in AOC.  The buy-in formula was developed by the AOC board of directors and approved by AOC's outside counsel, Dan Mohan.  Elliott Decl. ¶ 11, ECF No. 341-3.  There are two surgery centers associated with AOC: Athens Orthopedic Clinic Ambulatory Surgery Center, LLC ("ASC") and Athens Orthopedic Clinic Ambulatory Surgery Center – Loganville, LLC ("LASC").  Each LLC's members are physicians who are partners in AOC.  ASC's members all own equal shares in ASC.  LASC's members all own equal shares in LASC except one, who owns a smaller percentage.  Both surgery centers distribute profits to their members each quarter based on ownership percentage.  Many members of the surgery center LLCs perform no surgeries at the surgery centers.

Relator alleges that the amount of some physician partners' buy-ins to AOC, ASC, and LASC were based on the volume of referrals the physicians were expected to make to the surgery centers and ancillary services offered by AOC, such as imaging, orthotics, and therapy.  According to AOC CEO Kayo Elliott, neither the buy-in formulas nor the buy-in amounts were based on or determined by the patients or revenue the physician would bring to AOC, ASC, or LASC.  Elliott Decl. ¶¶ 11, 34.  Relator did not point to evidence that any buy-in amount for AOC was

determined in part by anticipated referrals to the surgery centers or AOC's ancillary services.[6]  Relator likewise failed to point to any other evidence to suggest that the AOC buy-ins were remuneration to induce referrals.  Accordingly, Defendants are entitled to summary judgment on Claim # 2.

Regarding the surgery center buy-ins, Relator cited evidence suggesting that the buy-in for ASC was lower for some physicians than others.  Pl.'s Resp. to Defs.' Mot. for Summ. J. on AKS Ex. 1, Buy-In Charts, ECF No. 399-1.  But Relator did not point to any evidence that any buy-in amount depended on the volume or value of referrals the physician was expected to make to the surgery center instead of a legitimate business consideration.  Thus, she has not created a genuine fact dispute that the surgery center buy-in amounts were set *to induce referrals*, and Defendants are entitled to summary judgment on Claims # 5 and # 23.

Relator did point to evidence to create a genuine fact dispute on Claim # 15, which is based on AOC's 2011 acquisition of Providence Orthopedics.  Providence's doctors, Michael S. Smith and David C. Harkins, joined AOC as partners.  Relator did not point to any evidence suggesting that allowing Drs. Smith

---

[6] Relator asserts that physician buy-ins ranged from $0.00 to $400,000, citing a collection of unexplained charts.  Pl.'s Resp. to Defs.' Mot. for Summ. J. on AKS Ex. 1, Buy-In Charts, ECF No. 399-1.  Based on the Court's review, none of the charts establishes that any physician had a buy-in of $0 for AOC.  And, the charts do not establish that the buy-in amounts depended on anticipated referrals.

and Harkins to become partners in AOC as part of the merger violated the Anti-Kickback Statute.  But the members of AOC "agreed that Drs. Smith and Harkins" would be allowed to become members of the surgery center LLCs "with no buyin [sic] to the ASC to become an equal partner, equal buyin [sic] for Loganville ASC and not allowed to participated [sic] in any outside ASC." Pl.'s Resp. to Defs.' Mot. for Summ. J. on AKS Ex. 13, Partners Meeting Minutes (Aug. 22, 2011), ECF No. 399-6 at 3.  Drs. Smith and Harkins "agreed to bring 50-75% of their outpatient surgical cases to the Athens ASC over the 2 year time period which will be applied as their buyin [sic]."  *Id.*[7]  Construing all reasonable inferences in Relator's favor, a reasonable juror could conclude that this evidence establishes that Drs. Smith and Harkins were each given a valuable ownership interest in ASC in exchange for bringing at least half of their outpatient surgical cases to the Athens surgery center.  This type of remuneration fits within the straightforward quid pro quo category that is clearly forbidden by the Anti-Kickback Statute, and the Court thus finds that Defendants are not entitled to

---

[7]  Relator also asserts that when AOC merged with Providence Orthopedics, it overpaid for Providence in exchange for guaranteed referrals to the ASC.  To support this assertion, Relator cites a valuation expert who considered the net assets received by AOC, not the value of the entire practice.  The report does not demonstrate that AOC paid more to acquire Providence than the practice was worth, so to the extent that Relator seeks to assert an Anti-Kickback Statute claim under this theory, she did not point to evidence to create a genuine fact dispute.

summary judgment on Claim # 15.   They shall, however, be permitted to present evidence regarding advice of counsel related to this transaction because genuine fact disputes exist on whether Defendants disclosed relevant facts to their lawyers and relied in good faith on their lawyers' advice.

    B.   Bonuses (Claims # 1, # 3(a), # 19, # 21)

    In addition to her Anti-Kickback Statute buy-in claims, Relator contends that AOC's compensation to its partner physicians, non-partner employee physicians, and physician assistants included bonuses in exchange for referrals to the surgery centers and AOC-owned ancillary services like imaging and therapy.   The formulas for partner physician bonuses differed from the formulas for employees, and the Court will examine each type of bonus in turn.

    *1.   Partner Physician Bonuses (Claim # 1)*

    CEO Elliott testified that the formula for calculating physician partners' quarterly bonuses resulted in bonuses that did not vary based on the physician's volume or value of referrals.   Elliott Decl. ¶ 28.   Neither side pointed to evidence that clearly sets forth the formulas used to calculate partner physician bonuses.   Relator failed to point to any evidence that the partner physician bonuses were based on each individual physician's volume or value of ancillary service referrals.

16

In support of her contention that an individual physician's referrals to internal ancillary services (such as imaging, orthotics, and therapy) affected their bonuses, Relator relies on a 2014 document that explains how to use a series of worksheets to calculate partner physician bonuses.  Pl.'s Resp. to Defs.' Mot. for Summ. J. on AKS Claims Ex. 20, Overview Doctor Compensation, ECF No. 399-13 at 2.[8]  Relator's main argument is that a portion of the ancillary receipts were distributed based on each physician's "OH%," which is the individual physician's receipts divided by total receipts.  But the worksheets do not clearly reflect final bonuses or explain how OH% affects them.  Plus, the worksheets contain three different OH% numbers for each physician, calculated three different ways.  *Id.* at Worksheet 3, 5, 6, ECF No. 399-13 at 5, 7, 8.  Relator cited no evidence to clear up this and other discrepancies, and the document does not establish that partner physician bonuses in 2014 were intended to induce referrals to ancillary services.  Thus, the Court and any future factfinder would be left to speculate as to the connection between this document and any compensation for referrals.  Relator has simply failed to create a genuine fact dispute that the physician

---

[8] As far as the Court can tell, the 2014 document is the only specific evidence Relator cited on the partner physician bonus formula.

partner bonuses were set *to induce referrals*, and Defendants are entitled to summary judgment on Claim # 1.[9]

    2.   *Employee Bonuses (Claims # 3(a), # 19, # 21).*[10]

As previously noted, Relator also claims that employee bonuses included amounts to induce referrals. AOC's CEO admitted that in the past, the bonus model for employee physicians and physician assistants was based on each employee's total receipts, including any receipts for internal ancillary services to which employees referred patients, like durable medical equipment, physical therapy, and imaging. Elliott Dep. 131:15-132:19, 133:10-134:18 (Apr. 1, 2021), ECF No. 341-24. Defendants contend that the Anti-Kickback Statute's bona fide employee safe harbor applies and any amounts paid to these employees are not "remuneration." Under the Anti-Kickback Statute, "illegal remunerations" do not include "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B).

---

[9] Relator asserts that AOC admitted that Drs. Smith and Harkins received bonuses for referrals to ancillary services, but the testimony she cited in support of this assertion does not establish that bonuses were based on receipts for ancillary services. AOC 30(b)(6) Dep. 334:11-336:14 (Mar. 15, 2021), ECF No. 341-6 (generally discussing bonus calculations, but not establishing that the bonuses were based on referrals).

[10] Claim # 3 alleges that employee physician bonuses violated both the Anti-Kickback Statute and the Stark Law. This section only addresses the Anti-Kickback Statute claim, which the Court refers to as # 3(a).

Relator contends that Defendants should not be permitted to raise the bona fide employee safe harbor because it is an affirmative defense that Defendants did not specifically enumerate in their answers. The Court understands that a party generally waives its right to raise an affirmative defense at trial if the party fails to raise the defense in its pleadings. *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988). But if a "plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c)" by raising the defense in a pleading "does not cause the plaintiff any prejudice." *Id.* Absent prejudice, "it is not error for the trial court to hear evidence on the issue." *Id.* Here, Relator clearly anticipated that Defendants would raise the bona fide employee defense because her complaint repeatedly alleges that the safe harbor does not apply—allegations that Defendants denied in their answers. During discovery, Relator's counsel explored the compensation structure and questioned Defendants' witnesses on facts related to the safe harbor defense. Thus, Relator had notice that Defendants planned to raise the defense and is not prejudiced by Defendants' failure to enumerate it as an affirmative defense in their pleadings.

Relator contends that even if the defense is permitted, genuine fact disputes preclude summary judgment on it. Relator does not appear to dispute that the employee physicians and

physician assistants are bona fide employees of AOC.[11]   But she argues that the payments these employees received were not "for employment in the provision of covered items or services."   42 U.S.C. § 1320a-7b(b)(3)(B).   There is also no real dispute that their bonuses were based on their receipts, which included both receipts for healthcare services to AOC's patients and receipts for internal ancillary services that were provided following a referral.   *See* AOC 30(b)(6) Dep. 334:11-336:14 (Mar. 15, 2021), ECF No. 341-6 ("Mar. 2021 30(b)(6) Dep.") (explaining that if an employee physician's receipts included receipts from ancillary services, they were included in the physician's bonus).

Relator does not contend that there is any problem with the portion of each bonus based on receipts for healthcare services provided to patients by employee physicians and physician assistants, but she maintains that the portion of each bonus based on receipts for the ancillary services provided by others following a referral was not payment "for employment in the provision of covered items or services."   42 U.S.C. § 1320a-7b(b)(3)(B).   A reasonable juror could conclude that this portion of the bonus is a payment for a referral.   Defendants did not clearly respond to this argument or explain how referrals for internal ancillary services constitutes the

_____

[11] Relator contends that the *partner* physicians are not employees within the meaning of the safe harbor, but she did not clearly argue or point to evidence that the employee physicians and physician assistants are not employees.

provision of covered items or services.  It is one thing to give a patient a prescription for an MRI or physical therapy.  It is another thing to tell the patient where to go for these services, and Defendants pointed to no authority that AOC was entitled to pay its employees individual bonuses based on their volume of referrals for internal ancillary services.  The Court is skeptical of this claim, but Relator has likely created a genuine fact dispute as to whether employee physicians and physician assistants received bonuses that were based in part on the volume or value of their internal ancillary referrals. Thus, the Court finds Defendants are not entitled to summary judgment on Claims # 3(a), # 19, and # 21.  Finally, the Court finds that genuine fact disputes exist as to whether Defendants disclosed all relevant facts to their lawyer and relied in good faith on their lawyer's advice on the bonus structure for employee physicians and physician assistants, so Relator's summary judgment motion on advice of counsel for these claims is denied.

> C.   Distributions (Claims # 4, # 22)

Relator claims that the surgery centers paid kickbacks to their physician owners in the form of distributions that were based on the number of referrals they made to the surgery centers.  Defendants contend that Relator cannot point to evidence that the distributions were made as an inducement for

sending patients to the surgery centers because it is undisputed
that both surgery centers distribute profits to their members
each quarter based on ownership percentage, not based on the
volume or value of their referrals.  It is also undisputed that
many members of the surgery center LLCs perform no surgeries at
the surgery centers, but they receive the same distributions as
the members who do perform surgeries at the surgery centers.
Relator did not clearly respond to this argument or present any
authority that the equal distributions to the surgery centers'
owners violated the Anti-Kickback Statute.  Accordingly, the
Court grants Defendants' summary judgment motion as to Claims #
4 and # 22.

> D.    Discounts and Rebates (Claims # 6, # 24, # 28)

In addition to her compensation-related claims, Relator
contends that Defendants violated the Anti-Kickback Statute by
obtaining implants, equipment, and other supplies for free or at
deep discounts in exchange for recommending items to or
purchasing items for Medicare and Medicaid patients.  Defendants
contend that none of the discounts and rebates they received
were "remuneration" because they were permitted under a discount
safe harbor.  Defendants also argue that Relator cannot
establish that any of the discounts or rebates induced
Defendants to purchase or recommend items (like medical devices)
for which payment may be made under a federal healthcare

program.  Relator's discount claims are based on discounts from several vendors.  The Court carefully examined the evidence Relator cited in her counterstatement of material facts and finds that the evidence does not support most of Relator's Anti-Kickback Statute discount claims.

For some claims, Relator points to evidence that AOC negotiated a discount, but she did not point to evidence that the discounts were to induce Defendants to purchase or recommend items for Medicare or Medicaid patients.  Thus, Defendants are entitled to summary judgment on the following Anti-Kickback Statute claims: Claim # 6(a) – Arthrex anchors; Claim # 6(b) – Linvatec towers; Claim # 6(e) – Monovisc; Claim # 6(f) – Cosmed equipment; Claim # 6(g) – Southern Orthopaedics plates; Claim # 6(h) – United Orthopedics kits; Claim # 6(i) – SBI plates; Claim # 28(a) – Crosslink implant; Claim # 28(b) – Stryker drill.

For other claims, Relator pointed to evidence that when AOC purchased certain items, it received a "free" accompanying piece of equipment that was required for use with the purchased items. Relator did not point to evidence that the "free" equipment had any value outside of being used with the purchased items or that the items were used on any Medicare or Medicaid patients.  For these reasons, no genuine fact dispute exists on the following Anti-Kickback Statute claims: Claim # 6(d) – Mitek VAPR unit; Claim # 24 - Exos braces; Claim # 28(c) – Smith & Nephew

generator.   And Defendants are entitled to summary judgment on these claims.

Relator has pointed to enough evidence to create a genuine fact dispute on one discount claim: Claim # 6(c) – Mitek anchors.  ASC Director Denise Kesler asked a DePuy Synthes Mitek sales representative for the best possible price on metal implants for use in Medicare patients because Medicare did not reimburse for the implants if the surgery was done at the ASC instead of a hospital.[12]  McKenzie Decl. ¶ 6, ECF No. 394-3.  The sales representative arranged for a bulk discount under which AOC ordered fifteen metal implants for use in Medicare patients, plus twenty-nine bioabsorbable implants.  *Id.* ¶ 7.  The 32% discount of the total purchase price covered the entire price of all the metal inserts, so the metal inserts intended for Medicare patients were "free."  *Id.*  A reasonable juror could conclude that the discount induced AOC to purchase the metal implants for use in Medicare patients.  There is a safe harbor for discounts that meet certain requirements, and Defendants assert that any discount they received is protected by the safe

---

[12] The parties did not point to evidence or authority on the rules for Medicare reimbursement for a surgery requiring an implant that takes place in an ambulatory surgery center.  Medicare only pays for medically necessary procedures, so it would be incongruous for Medicare to cover an implant procedure but not pay for the implant; presumably, the cost of the implant is bundled into the cost of the procedure but the procedure is reimbursed at a lower rate if it is performed at a surgery center instead of a hospital.

harbor, *as a matter of law*.[13]   But Defendants did not submit any evidence from which the Court can find, as a matter of law, that the Mitek anchor transaction is a protected discount, so the Court cannot conclude that Defendants are entitled to summary judgment on its safe harbor defense.   This claim remains pending for trial.   Relator did not specifically move for summary judgment on an advice-of-counsel defense on Claim # 6(c); if Defendants can establish that they sought and received an attorney's advice on the Mitek anchor transaction, they may introduce it at trial.

### E.   Orthotics Contracts (Claims # 12, # 13, # 14)

Relator claims that AOC violated the Anti-Kickback Statute by entering a series of agreements with third-party orthotics providers under which AOC referred 100% of its orthotics patients to the third-party orthotics provider during the agreement period, billed Medicare for the provider's services and devices as if AOC had provided them, and kept a fixed percentage of the collected amount.   *See* Hughes Decl. ¶¶ 2-3, ECF No. 389-6 (explaining the arrangement between AOC and

---

[13] Relator contends that Defendants should not be permitted to raise the discount safe harbor because it is an affirmative defense that Defendants did not enumerate in their answers.   Relator anticipated that Defendants would raise the discount defense because her complaint repeatedly alleges that the safe harbor does not apply—allegations that Defendants denied in their answers.   During discovery, Relator's counsel explored the discounts and questioned Defendants' witnesses on facts related to this safe harbor.   Relator had notice that Defendants planned to raise the defense, so she is not prejudiced by Defendants' failure to enumerate it as an affirmative defense in their pleadings.

Atlanta Prosthetics & Orthotics from 2012 to 2013); Jones Decl. ¶ 7, ECF No. 389-5 (explaining the arrangement between AOC and HRJ Custom Orthotic Fabrication Services in 2008). Defendants did not clearly move for summary judgment on these specific claims in their Anti-Kickback Statute summary judgment motion. To the extent that Defendants' motion could be construed to seek summary judgment on these claims, summary judgment must be denied because a reasonable juror could conclude from Relator's evidence that AOC received payments for its referrals to orthotics providers. Defendants also did not point to any evidence to suggest that they disclosed all material facts to their attorney or that they relied in good faith on advice given by the attorney regarding the orthotics arrangements. Relator's summary judgment motion is thus granted as to the advice-of-counsel defense on Claims # 12, # 13, and # 14, and Defendants shall not be permitted to raise the advice-of-counsel defense on these claims.

F.   Radiology Agreements (Claim # 16(a))[14]

Relator claims that AOC violated the Anti-Kickback Statute by entering agreements with external radiology groups to interpret the results of all MRI and CT images taken on AOC's imaging equipment. The Court refers to this claim as Claim #

---

[14] Claim # 16 also encompasses claims that billing for imaging violated the Stark Law (# 16(b)) and the Anti-Markup Rule (# 16(c)). Those claims are not at issue in this motion and are addressed below.

16(a).  There is no dispute that AOC had a contract with North Metropolitan Radiology Associates under which AOC paid North Metropolitan a flat fee for each scan its radiologists interpreted, then AOC billed Medicare "globally" for both the technical and professional components of the imaging instead of billing only for the technical component it actually completed and having North Metropolitan bill for the professional component it completed.  North Metropolitan was willing to accept less than what it could have collected had it billed the payors directly because AOC provided a steady stream of referrals.  Phillips Decl. ¶¶ 7-8, ECF No. 387-3.  AOC later had a similar agreement with Athens Radiology Associates.

Defendants did not clearly move for summary judgment on Claim # 16(a).  To the extent that Defendants' Anti-Kickback Statute summary judgment motion could be construed to seek summary judgment on these claims, summary judgment must be denied because a reasonable juror could conclude from Relator's evidence that AOC received remuneration (the ability to collect for services it did not provide) for its referrals to the external radiology groups.  The Court finds, though, that genuine fact disputes exist on whether Defendants reasonably relied on advice of counsel in structuring their arrangements with the external radiology groups, and the Court finds that

Defendants should be permitted to raise the advice-of-counsel defense on Claim # 16(a).

G.   Agreements with Third-Party Companies (Claim # 20)

Relator claims that individual physician Defendants entered (or tried to enter) research, consulting, and other agreements with third-party companies under which the physicians were paid to purchase the third-party companies' products, such as implants, for use in their patients.  Defendants argue that Relator cannot show that any of the payments were illegal remunerations because there is no evidence that any payments for research or consulting agreements were inconsistent with fair market value.  In response, Relator asserts that in 2005, one doctor, Dr. John Dorris, solicited a kickback in exchange for purchasing implants from one manufacturer.  Dr. Dorris is not a defendant in this action, Relator pointed to no evidence that he was employed by AOC after 2005, and Relator did not explain why his conduct should be imputed to anyone else.  Thus, the evidence regarding Dr. Dorris does not create a genuine fact dispute on Claim # 20.

The only other evidence on Claim # 20 that Relator pointed to in her response to the Anti-Kickback Statute summary judgment motion is evidence that Dr. Ormonde Mahoney was an inventor-consultant with Stryker Orthopedics and had royalty and consulting agreements with the company.  Relator hints that Dr.

Mahoney's royalty and consulting payments were not for his inventions and surgical innovations but were instead to induce him to use Stryker products in "almost all" of his surgeries. Pl.'s Counter Statement of Facts – AKS ¶ 71, ECF No. 394-1. The evidence she cited, though, does not support this assertion. *See* Mahoney Dep. 207:18-208:2, ECF No. 41-23 (testifying that Mahoney used products from approximately seven manufacturers other than Stryker, though he used Stryker products "the majority" of the time); 210:24-211:15 (stating that Mahoney reported to Stryker the time he spent on inventions and that Stryker verified it). Relator did not clearly point to any other evidence to suggest that Dr. Mahoney's agreements with Stryker were a sham to mask illegal kickbacks. Accordingly, Relator did not create a genuine fact dispute on Claim # 20 based on Dr. Mahoney's agreements with Stryker. Relator did not point to any other evidence that any other doctor had an agreement with a third-party company under which the doctor received illegal remunerations for recommending medical products. Accordingly, Defendants are entitled to summary judgment on Claim # 20.

## III. Defendants' Summary Judgment Motion – Stark Law Claims (ECF No. 346)

In addition to her FCA claims based on violations of the Anti-Kickback Statute, Relator asserts that Defendants violated the Stark Law (Claims # 3(b), # 16(b), # 25, # 29, # 31, # 35,

# 36).    The   Stark   Law   prohibits   physicians   from   referring Medicare   and   Medicaid   patients   to   an   entity   for   "designated health   services"   (also   called   ancillary   services)   if   the physician   has   a   prohibited   financial   relationship   with   the entity.  42  U.S.C.  §  1395nn(a)(1).    The  Stark  Law  also  forbids physicians   from   submitting   Medicare   and   Medicaid   claims   for services   furnished   pursuant   to   a   prohibited   referral.  *Id.*  § 1395nn(a)(1)(B);  *accord id.*  §  1395nn(g)(1)  ("No  payment  may  be made  under  this  subchapter  for  a  designated  health  service  which is  provided  in  violation  of  subsection  (a)(1).").    To  establish an   FCA   claim   based   on   a   Stark   Law   violation,   Relator   must establish  (1)  a  "financial  relationship"  between  a  physician  and medical  entity,  (2)  a  referral  from  the  physician  to  the  medical entity  for  designated  health  services,  and  (3)  a  claim  to  a federal  health  program  by  the  medical  entity  for  designated health  services  furnished  pursuant  to  the  referral.

AOC  provides  imaging  (including  MRI  and  CT  scans),  physical therapy,  and  occupational  therapy  at  its  main  office  and  several satellite   locations.    AOC   also   dispenses   durable   medical equipment   and   orthotics   from   its   main   office   and   several satellite   locations.    These   services   are   "designated   health services"  under  the  Stark  Law.   42  U.S.C.  §  1395nn(h)(6).   There is   no   dispute   that   AOC's   physicians   referred   Medicare   and Medicaid  patients  to  AOC's  internal  designated  health  services.

Relator contends that the referrals were all prohibited under the Stark Law.  AOC argues that the referrals were allowed because they fall within the "in-house ancillary services exception" to the Stark Law.  AOC further argues that none of the physicians had a prohibited financial agreement that made their referrals improper because their compensation agreements are protected by the "bona-fide employee exception."[15]  The Court addresses each issue—and the relevant facts—below.

A.   In-Office Ancillary Services Exception

Defendants assert that Relator's Stark Law claims fail as a matter of law because of the "in-office ancillary services exception."  Under the exception, the Stark Law's prohibition on referrals does not apply to physician referrals for ancillary services if the services "are furnished personally" by the "referring physician," a "physician who is a member of the same group practice as the referring physician," or an "individual who is supervised by the referring physician or, if the referring physician is in a group practice, by another physician

---

[15] Relator contends that Defendants should not be permitted to raise the Stark Law exceptions because they are affirmative defenses that Defendants did not specifically enumerate in their answers.  Relator anticipated that Defendants would raise the exceptions because her complaint repeatedly alleges that they do not apply—allegations that Defendants denied in their answers.  During discovery, Relator's counsel explored the exceptions and questioned Defendants' witnesses on facts related these defenses.  The Court finds that Relator had notice that Defendants planned to raise the defenses and is not prejudiced by Defendants' failure to enumerate them as affirmative defenses in their pleadings.

in the group practice." 42 C.F.R. § 411.355(b)(1). Defendants argue that the ancillary services at issue here were performed by another AOC physician or by an individual supervised by an AOC physician. To be entitled to the exception, AOC must establish that the referring physician was a member of "the same group practice" as the physician performing or supervising the service.

The regulations define "group practice" as a physician practice that contains at least two physician members, "whether employees or direct or indirect owners," and meets several conditions. 42 C.F.R. § 411.352(b). One of those conditions is: "No physician who is a member of the group practice directly or indirectly receives compensation based on the volume or value of his or her referrals" unless the compensation satisfies the regulation's special rules for profit shares and productivity bonuses. 42 C.F.R. § 411.352(g). As discussed *supra* § II.B, there is a genuine fact dispute on whether bonuses for employee physicians were based in part on the volume or value of their internal ancillary referrals. Defendants did not argue or establish that the compensation was an acceptable profit share or productivity bonus. Thus, a jury could conclude that AOC is not a "group practice" within the meaning of the in-office ancillary services exception, and Defendants are not entitled to summary judgment based on this exception.

B.   Bona Fide Employee Exception

Defendants contend that even if there are genuine fact disputes on whether the in-office ancillary services exception applies, the physicians did not have a "financial relationship" with AOC under which the referrals were improper because they had a "bona fide employment relationship" with AOC.  A physician has a "financial relationship" with an entity if he has "an ownership or investment interest in the entity" or if he has a "compensation arrangement" with the entity.   42 U.S.C. § 1395nn(a)(2).  Amounts paid by an employer to a physician who has a "bona fide employment relationship" with the employer are not "compensation arrangements."  *Id.* § 1395nn(e)(2).

The "bona fide employee relationship" exception only applies if the amount of remuneration for the employment is consistent with the fair market value of the employee's services, "is not determined in any manner that takes into account the volume or value of referrals by the referring physician," and "is provided under an arrangement that would be commercially reasonable even if no referrals were made to the employer."  42 C.F.R. § 411.357(c).  Accordingly, a compensation agreement that takes into account the volume or value of designated health services referrals by the referring physician is *not* protected under the bona fide employment relationship exception.  As discussed *supra* § II.B, there is a genuine fact

dispute on whether bonuses for employee physicians were based in part on the volume or value of their internal ancillary referrals.  Thus, a reasonable juror could conclude that their compensation agreements are not excepted from the referral prohibition.  Defendants are not entitled to summary judgment based on this exception as to employee physician referrals.

Turning to the partner physicians, even if Defendants had presented evidence that the partner physicians had bona fide employment relationships with AOC, that would only establish that their *compensation arrangements* were not "financial relationships."  It is undisputed that each partner physician has an ownership interest in AOC, and an ownership interest is a "financial relationship" under which referrals are prohibited unless an exception like the in-office ancillary services exception applies.  42 U.S.C. § 1395nn(a)(2).  Defendants did not assert that an exception to the referral prohibition related to ownership interests applies.  Accordingly, Defendants have not established that the partner physicians lacked a "financial relationship" with AOC, and they are not entitled to summary judgment on Stark Law claims based on partner physician referrals to internal designated health services.

C.   Scienter

Defendants argue that even if they have not established a valid exception to the Stark Law's prohibition on referrals for

designated health services, Relator cannot establish that they acted with scienter because AOC executives conferred with counsel and accountants regarding physician compensation.  The Court finds that genuine fact disputes exist on whether Defendants disclosed all relevant facts to their advisors and relied in good faith on their advisors' advice.  Accordingly, although Defendants shall be permitted to raise the advice-of-counsel defense on the Stark Law claims, they are not entitled to summary judgment on this defense.

## IV. Defendants' Summary Judgment Motion – Viscosupplements (ECF No. 342)

Relator claims that AOC violated the FCA when it submitted claims to the Government for viscosupplementation procedures (Claims # 10 and # 11).  Viscosupplements, which are marketed under brand names including Synvisc, are injectable medical products used to treat joint pain caused by osteoarthritis.  Viscosupplements are considered Class III medical devices subject to approval by the U.S. Food and Drug Administration.  Defs.' Mot. for Summ. J. re Viscosupplements Ex. 5, Email from N. Hoffman to D. Mohan (Apr. 8, 2010, 8:31 PM), ECF No. 342-7.[16]

---

[16] In ruling on this motion, the Court did not rely on the report of Harold Pellerite, an expert on FDA regulations for medical devices. Defendants moved to exclude Pellerite's testimony in its entirety because it includes legal conclusions.  In her response to Defendants' motion, Relator relied on the report solely to establish that when a medical device has been exported for foreign use with foreign labeling, the FDA requires approval before the device can be marketed in the United States.  The Court finds that this testimony is an

Medicare does not cover claims for items or services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). To be "reasonable and necessary," a device must be "safe and effective" and "not experimental"—which means that a device must have FDA approval or clearance. *Banks v. Sec'y of Health & Hum. Servs.*, No. 21-11454, 2021 WL 3138562, at *1 (11th Cir. July 26, 2021) (alterations adopted) (quoting Medicare Program Integrity Manual § 13.5.4 (2019)); *accord Dan Abrams Co. LLC v. Medtronic Inc.*, 850 F. App'x 508, 509 (9th Cir. 2021) (stating that to be reimbursable, a device must "have FDA approval/clearance"). Relator claims that AOC knowingly purchased foreign or reimported viscosupplements that did not have the requisite FDA approval, used them in patients, and submitted claims to government healthcare programs for this treatment, certifying that the treatment was medically necessary. AOC's officers knew beginning in at least 2008 that there were legal risks

---

impermissible legal conclusion that must be excluded. Although an expert may offer an opinion on an ultimate issue of fact pursuant to Federal Rule of Evidence 704, an expert may not offer legal conclusions. *See, e.g., Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). An expert offers a legal conclusion when he testifies "to the legal implications of conduct," and such testimony is improper because "the court must be the jury's only source of law." *Id.* Thus, to the extent that Pellerite intends to testify at trial regarding the legal implications of conduct, such testimony will not be permitted, and Defendants' motion to exclude such testimony (ECF No. 349) is granted. Defendants will need to object at trial if Relator attempts to introduce legal conclusion evidence. This ruling shall not be interpreted to exclude any fact testimony by Pellerite.

associated with buying foreign or reimported viscosupplements. *See* Defs.' Mot. for Summ. J. re Viscosupplements Ex. 3, Letter from B. Goncher to K. Elliott 1 (Dec. 23, 2008), ECF No. 342-5 (explaining legal requirements for importing foreign viscosupplements).

A. Purchases from QP Medical (Claim # 10)

In March 2010, AOC began purchasing viscosupplements from QP Medical through a sales representative named Edmund Long. Mar. 2021 30(b)(6) Dep. 49:25-50:14. After a sales representative from a competitor suggested there may be legal issues with buying viscosupplements from QP Medical, AOC CEO Kayo Elliott reached out to attorney Dan Mohan for advice. Mohan and another attorney advised Elliott that reimported viscosupplements may not meet Medicare's definition for "medically necessary"—a requirement of Medicare reimbursement. Defs.' Mot. for Summ. J. re Viscosupplements Ex. 5, Email from N. Hoffman to D. Mohan (Apr. 8, 2010, 8:31 PM), ECF No. 342-7. The attorneys advised Elliott, though, that if AOC was receiving a product that was "truly in the original packaging with the original labeling" and if the product had been properly stored, handled, and transmitted, then there was low risk of legal action by the FDA. *Id.*, Email from D. Mohan to K. Elliott (Apr. 15, 2010, 10:07 AM). Mohan advised CEO Elliott "to pay very careful attention that the product" AOC was getting was "in

original packages and with original labeling" and not compromised. *Id.*

AOC continued ordering viscosupplements from QP Medical, but Elliott received more information that made him question the arrangement. At that point, Elliott asked QP Medical's representative if QP Medical was a licensed distributor for Synvisc, and the representative responded that QP Medical was "a licensed distributor in Canada and the UK" and handled "all billing and shipping which comes from Canada or the UK." Defs.' Mot. for Summ. J. re Viscosupplements Ex. 6, Email from E. Long to K. Elliott (July 5, 2011, 3:39 PM), ECF No. 342-8. AOC stopped ordering viscosupplements from QP Medical in October 2011.

Based on this evidence viewed in the light most favorable to Relator, a reasonable juror could conclude that AOC knowingly purchased viscosupplements that lacked the required FDA approval when it purchased viscosupplements from QP Medical, a distributor that was not registered in the United States and that shipped its product from foreign countries. AOC asks the Court to conclude, *as a matter of law*, that it did not have the requisite intent because it consulted its attorneys regarding viscosupplement purchases. The Court finds that genuine fact disputes exist as to whether AOC disclosed all relevant facts to its lawyer and relied in good faith on its lawyer's advice.

Accordingly, AOC's summary judgment motion is denied as to Claim # 10, as is Relator's motion for summary judgment on the advice-of-counsel defense related to Claim # 10.

### B.   Purchases from Wicklow Enterprises (Claim # 11)

In 2018, AOC began purchasing viscosupplements from Wicklow Enterprises.[17]   Sapp. Dep. 239:9-17, ECF No. 342-20.   A representative from Wicklow's competitor later asked AOC employees whether Wicklow was a legal vendor of viscosupplements, so AOC asked Wicklow about it.   Wicklow's sales representative stated that Wicklow was a U.S. subsidiary of a U.K. company and that it was registered with the FDA with a valid premarket approval number for its viscosupplements product.   Defs.' Mot. for Summ. J. re Viscosupplements Ex. 17, Email from T. Sapp. To W. Power (Feb. 21, 2019, 4:46 PM), ECF No. 342-19.

Elliott forwarded the Wicklow information to Mohan and asked for advice.   In his response, Mohan's colleague noted that "the FDA only permits a product's original manufacturer to reimport products into the U.S. Market that are also manufactured here."   Defs.' Mot. for Summ. J. re

---

[17] At some point before 2018, Elliott and AOC's Chief Compliance Officer, Teresa Tolleson, received more documents warning that the purchase of foreign or reimported viscosupplements was illegal.  Pl.'s Resp. to Defs.' Mot. for Summ. J. re Viscosupplements Ex. 9, Letter from H. Pellerite to D. Haines (Feb. 15, 2005), ECF No. 395-5 at 2; Pl.'s Resp. to Defs.' Mot. for Summ. J. re Viscosupplements Ex. 12, Email from info@margievaught.com to T. Tolleson (Oct. 16, 2016, 9:14 PM), ECF No. 395-6.

Viscosupplements Ex. 20, Email from G. Jackson to D. Mohan (Mar. 13, 2019, 11:36 AM), ECF No. 342-22.  The lawyers advised AOC to get evidence that Wicklow was an approved distributor for viscosupplements.  *Id.*  Elliott instructed the staff to stop ordering viscosupplements from Wicklow.  Defs.' Mot. for Summ. J. re Viscosupplements Ex. 20, Email from K. Elliott to V. Walker (Mar. 13, 2019, 12:21 PM), ECF No. 342-22.

Wicklow's representative tried to salvage the business with AOC by sending more information to Elliott.  But the information established that Wicklow purchased viscosupplements from European wholesalers and repackaged those items for the U.S. Market.  Defs.' Mot. for Summ. J. Ex. 24, Email from G. Jackson to D. Mohan (July 2, 2019, 5:35 PM), ECF No. 342-22.  Although Wicklow had the required FDA authorizations and registrations to repackage and import viscosupplements to the United States, it did not have relationships with the original product manufacturers and was not "willing to represent and warrant as to the supply chain of the Products, or the appropriate storage of the Products" before Wicklow acquired them.  *Id.*  The lawyers advised AOC not to purchase viscosupplements from Wicklow based on risks related to safe and appropriate storage of the products and lack of an authorized supply chain.  *Id.*  AOC did not purchase from Wicklow again.

Based on the evidence viewed in the light most favorable to Relator, a reasonable juror could conclude that AOC knowingly purchased viscosupplements that lacked the required FDA approval when it purchased viscosupplements from Wicklow, a distributor that acquired the viscosupplements on the international gray market and could not verify the safe and appropriate storage of the products.  AOC asks the Court to conclude, *as a matter of law*, that it did not have the requisite intent because it consulted its attorneys regarding Wicklow viscosupplements.  But genuine fact disputes exist on this issue because the present record suggests that AOC did not consult its lawyers about Wicklow until six months after it started purchasing the products.  In addition, genuine fact disputes exist as to whether AOC disclosed all relevant facts to its lawyer and relied in good faith on its lawyers' advice.  Accordingly, AOC's summary judgment motion is denied as to Claim # 11, as is Relator's summary judgment on the advice-of-counsel defense related to Claim # 11.

C.   Claims # 10 & # 11 Against Other Defendants

In addition to her claims against AOC, Relator asserts Claims # 10 and # 11 against ASC, LASC, and individual physicians Joseph T. Johnson, M.D., David I. Katz, M.D., Ormonde M. Mahoney, M.D., Michael S. Shuler, M.D., M. Shane Smith, M.D., and William C. Tally, M.D.   Relator did not point to any

evidence that any entity other than AOC presented a claim to a Government healthcare program for illegal viscosupplements. Relator generally argues that the individual physicians, who are owners of AOC, had some level of oversight regarding AOC's billing procedures, but she did not present evidence to suggest that they knowingly caused AOC to submit bills for illegal viscosupplements. Accordingly, the Court grants these Defendants' summary judgment motion as to Claims # 10 and # 11.

## V.   Defendants' Summary Judgment Motion — Orthotics and Durable Medical Equipment (ECF No. 345)

Relator asserts three claims that AOC violated the FCA when it billed for certain orthotics services and durable medical equipment: Claim # 17 – Defendants submitted claims for durable medical equipment without proper authorization; Claim # 18 – Defendants submitted claims for orthotics furnished by an unlicensed provider while billing under the national provider identifier for Joseph Johnson; and Claim # 27 – Defendants back-billed for durable medical equipment. The Court addresses each claim below.

### A.   DMEPOS Number and Back-Billing (Claims # 17 and # 27)

A supplier of durable medical equipment like braces, splints, walking boots, and crutches must have a "DMEPOS number" for the office from which the equipment is dispensed before it can receive payment for a Medicare-covered item. *See* 42 C.F.R. § 424.57(b)(1) (A "supplier must enroll *separate physical*

*locations* it uses to furnish Medicare-covered DMEPOS") (emphasis added).  And, to receive payment from Medicare, the item must be furnished "on or after" the date the supplier is issued its DMEPOS number.  *Id.* § 424.57(b)(2).

AOC does not dispute that during a certain time period it lacked separate DMEPOS numbers for each physical location.  AOC eventually applied for and received separate DMEPOS numbers for each location.  Relator asserts that after AOC realized that it needed to have separate DMEPOS numbers but before it obtained them, AOC provided durable medical equipment but held the bills until after it received approval, then "back billed" under the new DMEPOS numbers.  This claim is Claim # 27.  Defendants assert that Relator cannot present evidence of any back billing.  Relator addresses this issue summarily in a footnote of her response brief, but she did not clearly point to any evidence that any Defendant furnished durable medical equipment then held the bills pending issuance of a DMEPOS number.  Accordingly, Defendants are entitled to summary judgment on Claim # 27.

There is no dispute that before AOC obtained DMEPOS numbers for its satellite locations, it billed federal healthcare programs for durable medical equipment as if it had been dispensed from the main office, even if it had been dispensed from a satellite office that did not have its own DMEPOS number.  This is Claim # 17.  AOC asks the Court to conclude *as a matter*

*of law* that these billing errors were simply honest mistakes because none of its employees (including Relator) knew about the DMEPOS requirements.   But, as discussed above, Medicare and Medicaid participants must familiarize themselves with the legal requirements for reimbursement, and "a person acts with reckless disregard—and thus 'knowingly'—under the FCA" if he has reason to know of facts that would lead a reasonable person to realize that the relevant act (here, billing for durable medical equipment without a DMEPOS number for the physical location) would result in a violation.   *Yates*, 21 F.4th at 1303.   A reasonable billing employee or compliance officer could read the regulation and determine that no satellite office was eligible for reimbursement without its own DMEPOS number—and that any claim for reimbursement without a valid DMEPOS number would thus be false.   Accordingly, AOC is not entitled to summary judgment on Claim # 17.

AOC seeks to assert an advice-of-counsel defense on Claim # 17 at trial.   Relator moved for summary judgment because AOC did not rely on advice of counsel to justify billing under a single DMEPOS number.   AOC did not present any evidence that it sought or received advice from counsel on how to bill for durable medical equipment before May 21, 2015, at which point counsel told AOC that all durable medical equipment locations needed to submit separate DMEPOS applications and to "get the new ones in

asap." Defs.' Mot. For Summ. J. on DME Ex. 3, Email Chain Between C. Cofer, D. Mohan, *et al.* (May 21, 2015), ECF No. 345-5. Accordingly, Relator's summary judgment motion is granted as to the advice-of-counsel defense on the DMEPOS issue, and AOC shall not be permitted to raise the advice-of-counsel defense as to Claim #17.

Relator also asserts Claim # 17 against ASC, LASC, Johnson, Katz, Mahoney, Shuler, Smith, and Tally. Relator did not present any evidence that any entity other than AOC presented a claim to a Government healthcare program without a proper DMEPOS number. Relator generally argues that the individual physicians, who are owners of AOC, had some level of oversight regarding AOC's billing procedures, but she did not present evidence to suggest that they knowingly caused AOC to submit bills without a proper DMEPOS number. Accordingly, the Court grants these Defendants' summary judgment motion as to Claim # 17.

B.  Orthotics by Unlicensed Provider (Claim # 18)

Medicare does not pay for custom-fabricated orthotics unless the item is "furnished by a qualified practitioner." 42 U.S.C. § 1395m(h)(1)(F)(i). A qualified practitioner is a person who is licensed in orthotics by the State in which the item is supplied. *Id.* § 1395m(h)(1)(F)(iii). Georgia has

required a license to practice orthotics since July 1, 2007. O.C.G.A. § 43-34-198(b).

In 2007, AOC hired Ross Jones to provide orthotics services for patients. Jones was not licensed to practice orthotics in Georgia. AOC contends that it did not know that Jones was unlicensed, but Jones testified that he did not have a Georgia orthotics license and that he told CEO Elliott so during the recruitment process. Jones Decl. ¶ 6, ECF No. 389-5. According to Jones, Elliott said that Jones would be covered under the "umbrella" of Dr. Johnson. *Id.* AOC billed for orthotics made by Jones under Dr. Johnson's national provider identifier, even though Dr. Johnson did not render or supervise the service. *See* Johnson Dep. 92:1-12, ECF No. 341-10 (stating that Dr. Johnson did not custom fit orthotics at AOC).

The Georgia Composite State Board of Medical Examiners investigated Jones and determined that he was unqualified to practice orthotics in Georgia. Jones Decl. ¶ 7. At that point, Elliott suggested that AOC hire Jones as an independent contractor through Jones's Virginia-based company, HRJ Custom Orthotic Fabrication Services, as if Jones were still in Virginia, since Virginia did not have an orthotist licensure requirement. *Id.* According to Jones, they reached an arrangement under which AOC would provide referrals to HRJ Custom, then bill Medicare as though AOC performed the work and

pay HRJ Custom 35% of the money collected from Medicare.  *Id.*
In 2008, the board of directors for AOC approved an arrangement
for AOC to "continue to use [Jones's] services through HRJ
Resources" if his Georgia license was denied.  Pl.'s Resp. to
Defs.' Mot. For Summ. J. on Orthotics Ex. 12, Board Minutes
(July 8, 2008), ECF No. 397-9.  A genuine fact dispute exists as
to whether AOC knowingly billed Government health programs for
orthotics that were not furnished by a qualified practitioner.
Therefore, AOC is not entitled to summary judgment on Claim #
18.

AOC seeks to assert an advice-of-counsel defense on Claim #
18 at trial.  Relator moved for summary judgment because AOC did
not rely on advice of counsel to justify billing for an
unlicensed orthotist.  AOC did not point to any evidence that
its attorney advised that it was acceptable to use an unlicensed
orthotist; rather, the evidence is that when AOC's CEO asked an
attorney about the issue, the attorney said to stop billing for
Jones.  AOC 30(b)(6) Dep. 116:11-19 (Nov. 2, 2021), ECF No. 344-
5 ("Nov. 2, 2021 30(b)(6) Dep.").[18]  AOC also argues that its CEO
consulted an attorney regarding the HRJ Custom arrangement, but
the CEO could not recall what information he gave the attorney
or what advice the attorney gave.  *Id.* at 99:17-102:17.  Thus,
the present record would not permit a reasonable juror to

---

[18] There is a genuine fact dispute on when AOC's CEO learned that Jones
was not licensed to practice orthotics in Georgia.

conclude that AOC disclosed all material facts to its attorney or that it relied in good faith on advice given by the attorney regarding billing for an unlicensed orthotist.  Accordingly, Relator's summary judgment motion is granted as to the advice-of-counsel defense on Claim # 18, and AOC shall not be permitted to raise the advice-of-counsel defense on this claim.

Relator also asserts Claim # 18 against ASC, LASC, Johnson, Katz, Mahoney, Shuler, Smith, and Tally.  Relator did not present any evidence that any entity other than AOC presented a claim to a Government healthcare program for unlicensed orthotics, so ASC and LASC are entitled to summary judgment on Claim # 18.  Relator does not dispute that Drs. Katz, Shuler, Smith, and Tally were not members of AOC when the board of directors approved the HRJ Custom arrangement, so they could not have caused a false claim to be submitted and are entitled to summary judgment on this claim.  Relator, though, did point to evidence that the AOC board of directors—which in 2008 included Drs. Johnson and Mahoney—knew that Jones was not licensed to practice orthotics and approved an arrangement for him to continue providing orthotics services through his company. Accordingly, the Court finds a genuine fact dispute on whether Drs. Johnson and Mahoney knowingly caused false claims to be submitted in connection with orthotics provided by Jones.

**VI.  Defendants' Summary Judgment Motion – Billing (ECF No. 347)**

Relator claims AOC violated the FCA when it submitted claims to the Government using "global billing" for certain imaging appointments.  According to Relator, these claims violate the Anti-Markup Rule, 42 C.F.R. § 414.50, and the Court refers to this claim as Claim # 16(c).  There is no dispute that AOC completed only the technical component of some imaging, then an external radiology group (either North Metropolitan Radiology Associates or Athens Radiology Associates) completed the professional component of interpreting the results.  AOC paid the external radiology group a flat fee for each scan it interpreted, then AOC billed Medicare "globally" for both the technical and professional components.  Mar. 2021 30(b)(6) Dep. 229:17-230:23.

The Anti-Markup Rule, 42 C.F.R. § 414.50, regulates billing for diagnostic tests like imaging when the tests are interpreted by a physician who does not share a practice with the billing entity that provides the technical component.  The Centers for Medicare and Medicaid Services ("CMS") has cautioned that the following arrangement violates several laws, including the Anti-Markup Rule: the physician who completes the professional component of a diagnostic test assigns her payment to the supplier of the technical component, then the supplier bills for both the test and the interpretation and pays the interpreting

49

physician a fee for the interpretation. *Medicare Claims Processing Manual*, Ch. 13, § 20.3.2.D, *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c13.pdf. CMS has also explained that global billing for a service that is split into a professional component and a technical component is only allowed when the same physician or entity provides both components. *Id.* § 150.D.[19]

Defendants contend that Relator cannot produce admissible evidence to demonstrate that the Defendants knowingly violated any billing rules for imaging because Relator did not identify an expert on this issue.  In response, Relator argues that she does not need an expert on this topic because the applicable federal regulations and the CMS guidance are clear.  Moreover, Relator points out that AOC's chief compliance officer, Teresa Tolleson, understands how to code imaging procedures and testified about this issue.

Tolleson, a certified professional coder, explained in the AOC 30(b)(6) deposition how the professional and technical modifier codes work for imaging and how AOC billed Medicare for imaging tests of patients as global without separating the professional and technical components.  Mar. 2021 30(b)(6) Dep.

---

[19] The CMS Manual Relator relies on was revised in 2021.  It is not clear from the present record what CMS guidance was available to AOC before then, but the applicable regulation, 42 C.F.R. § 414.50, was effective January 1, 2009.

226:16-227:15, 228:22-230:23; *see also* Pl.'s Resp. to Defs.' Mot. for Summ. J. on Billing Ex. 4, Email Chain between R. Hockaday, K. Elliott, and T. Tolleson (May 28, 2013), ECF No. 392-2 (discussing how to bill for imaging properly).  The Court is satisfied that Tolleson's testimony creates a genuine fact dispute on whether AOC knowingly violated billing rules when it billed globally for imaging even though an external radiology group performed the professional component.

Defendants argue that the rule does not apply when the billing entity and the interpreting physician share a practice. The regulation clearly states that "[a] performing physician shares a practice with the billing . . . supplier if he or she furnishes substantially all (which, for purposes of this section, means 'at least 75 percent') of his or her professional services through such billing physician or other supplier." 42 C.F.R. § 414.50(a)(2)(ii).  Defendants did not point to any evidence that AOC "shared a practice" with the external radiology groups or that it reasonably believed that either external radiology group furnished substantially all of its professional services through AOC.  Relator presented evidence that AOC's arrangement with North Metropolitan Radiology Associates constituted less than 5% of the radiology group's business for any given year.  Phillips Decl. ¶ 5.  Thus, Defendants' "share a practice" argument fails, and the Court

denies Defendants' summary judgment motion on billing for imaging (Claim # 16(c)) as to AOC (ECF No. 347).

AOC asserts that if there is a fact dispute on Claim # 16(c), it should be permitted to assert an advice-of-counsel defense at trial.  Relator moved for summary judgment on that issue.  Although AOC pointed to evidence that its CEO generally consulted with an attorney on AOC's arrangements with the two external radiology groups, their evidence also states that the lawyer did not "know about the reimbursement rules for governmental payers."  Defs.' Mot. for Summ. J. on Billing Ex. 5, Email from D. Mohan to K. Elliott (Nov. 5, 2020, 2:14 PM), ECF No. 347-7 at 2.  This evidence does not establish that the lawyer advised AOC on the correct way to bill Medicare for imaging or that AOC relied on his advice when it billed for imaging.  Accordingly, Relator's summary judgment motion is granted as to the advice-of-counsel defense on billing for imaging, and AOC shall not be permitted to raise the advice-of-counsel defense as to Claim #16 (Anti-Markup Rule).

Relator also asserts Claim # 16(c) against the other Defendants: ASC, LASC, Johnson, Katz, Mahoney, Shuler, Smith, and Tally, who seek summary judgment on it.  Relator did not present any evidence that any entity other than AOC presented a claim to a Government healthcare program using improper coding for imaging.  And although Relator generally argues that the

individual physicians, who are owners of AOC, had some level of oversight regarding AOC's billing procedures, she did not present evidence to suggest that they knowingly caused AOC to submit bills using improper coding for imaging.  Accordingly, the Court grants these Defendants' summary judgment motion as to Relator's claims based on improper billing for imaging.

## VII. Defendants' Summary Judgment Motion – Modifier 25, Modifier 59, and Evaluation & Management (ECF No. 348)

Relator claims that AOC violated the FCA when it submitted claims to Government healthcare programs using certain medical codes on its bills.  Relator's expert explained what the codes mean and how to use them correctly.  Relator's expert opines that Defendants overused both Modifier 25 and Modifier 59 to inflate their bills and that the level of evaluation and management ("E/M") services billed by Defendants is not supported by appropriate documentation.  Relator refers to these claims as Claim # 7 (Modifier 25), Claim #8 (Modifier 59), and Claim # 9 (E/M Level).

Defendants appear to acknowledge that the testimony of Relator's coding expert, Georgeann Edford, would create a genuine fact dispute on the claims based on AOC's billing for E/M services, use of Modifier 25, and use of Modifier 59.  Defendants argue that the Court should exclude Edford's testimony because she was not adequately disclosed.  Federal Rule of Civil Procedure 26(a)(2)(B) requires that an expert

witness disclosure be accompanied by a written report that contains "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; [and] (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years." If a party fails to identify a witness as required by Rule 26(a), the party may not use that witness to supply evidence on a motion or at trial. Fed. R. Civ. P. 37(c)(1).

Defendants argue that the Court should exclude Edford for three reasons. First, Defendants contend that Edford's expert report did not include her analysis of the Modifier 59 issue. It did. Pl.'s Resp. to Defs.' Mot. for Summ. J. on ModifiersEx. 6, Edford Report 36-37 (Sept. 20, 2021), ECF No. 390-6. Defendants learned during Edford's deposition that she inadvertently omitted some pages from one of the exhibits, but Relator's counsel said that he would produce the omitted pages during a break. The Court is not convinced that this omission warrants Rule 37 sanctions.

Second, Defendants argue that Edford did not provide "claim sheets" that she reviewed for each patient whose claim she reviewed. Instead, she provided only the patient name and the record number for each patient. According to Relator, the

"claim sheets" are patient medical records that were in Defendants' possession and produced by Defendants during discovery, and Defendants could identify the medical records based on the information Edford provided. Defendants do not contend that Edford's identification of the medical records was so vague or general that Defendants could not identify the relevant medical records already in their possession. Rule 37 sanctions are not warranted.

Third, Defendants contend that Edford failed to produce additional documents, namely her "audit sheets."[20] According to Relator, Edford made preliminary notes that were put into the spreadsheets that she relied on in developing her report; Edford did not produce the preliminary notes, but she did produce the spreadsheets. Defendants asked Relator's counsel to produce additional documents after Edford's deposition, and Relator's counsel responded with an email indicating a willingness to work with Defendants' counsel on the issue but also suggested that the additional documents were not necessary. There is no evidence that Defendants' counsel followed up to insist on production of the audit sheets. Under these circumstances, Rule 37 sanctions are not warranted. In summary, the Court declines

---

[20] Defendants also contend that Edford did not produce certain spreadsheets or unredacted patient numbers. Relator contends (and Defendants do not appear to dispute) that the spreadsheets she relied upon were produced, that the spreadsheets she did not produce were not relied upon, and that Defendants had adequate information to identify the relevant patient records.

to exclude Edford based on the alleged shortcomings in her expert disclosures.

Defendants contend that even if the Court does not exclude Edford, Edford's opinions are not admissible under Federal Rule of Evidence 702. Rule 702 requires (1) that the expert be qualified to testify on the subject, (2) that she employ a sufficiently reliable methodology, and (3) that her testimony assist the trier of fact in understanding the evidence or determining a fact at issue. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1304 (11th Cir. 2014). Defendants do not appear to dispute that Edford, a registered nurse and certified coding specialist with more than forty years of experience in the healthcare industry, is qualified to opine on proper billing practices in this action. Defendants argue that Edford's testimony is likely to confuse the issues and that she may not have applied her methodology in a reliable manner. These arguments are merely a repackaged version of Defendants' argument that they were unable to explore Edford's opinions thoroughly because she did not produce some documents to them. The Court has rejected that argument, and Defendants' attempt to reassert it as a reliability/unhelpfulness objection is likewise unpersuasive.

As to the contention that Edford's methodology was unreliable, the Court's job is to "make certain that an expert,

whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Defendants argue that Edford's testimony is unreliable because it is not based on sufficient facts or data.  Edford represents that she evaluated "a statistically valid random sample of claims from three separate payer populations to determine if the documentation in the medical records supported the services billed and paid."  Pl.'s Mot. for Summ. J. on Modifier Ex. 1, Edford Revised Expert Report 15 (Oct. 5, 2021), ECF No. 348-3.  Defendants fault Edford for relying on a statistician who determined what Edford's sample sizes should be and a consultant who processed the data produced by AOC so that Edford could analyze it.  An expert may rely on the work of others if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703.  Defendants did not point to anything in the present record to suggest that it was inappropriate for Edford to rely on these other individuals to help her ensure that she reviewed a statistically valid sample of Defendants' claims data.

Accordingly, the Court declines to exclude Edford based on the reliability of her methodology.

Because Edford's testimony creates a genuine fact dispute as to Claim # 7, Claim # 8, and Claim # 9 against AOC, AOC's summary judgment motion on these claims is denied.  AOC did not consult counsel regarding the use of these two modifiers or E/M levels, so the Court grants Relator's summary judgment motion on AOC's advice-of-counsel defense on Claims # 7, # 8, and # 9.

Relator also asserts Claims # 7, # 8, and # 9 against ASC, LASC, Johnson, Katz, Mahoney, Shuler, Smith, and Tally.  Relator did not present any evidence that any entity other than AOC presented a claim to a Government healthcare program using improper E/M codes, Modifier 25, or Modifier 59.  Relator generally argues that the individual physicians, who are owners of AOC, had some level of oversight regarding AOC's billing procedures, but she did not present evidence to suggest that they knowingly caused AOC to submit bills using improper E/M codes, Modifier 25, or Modifier 59.  Accordingly, the Court grants these Defendants' summary judgment motion as to Claims # 7, #8, and #9.

## VIII.    Defendants' Summary Judgment Motion — Retaliation (ECF No. 341)

Relator contends that while she was employed by AOC she alerted the physicians and management of FCA issues.  She claims that in response to her warnings, Defendants retaliated against

her in violation of the FCA (Claim # 55).  The FCA provides
relief from retaliatory adverse employment actions if the
employee "is discharged, demoted, suspended, threatened,
harassed, or in any other manner discriminated against in the
terms and conditions of employment because of lawful acts done
by the employee" in furtherance of an action under the FCA or
other efforts to stop FCA violations.  31 U.S.C. § 3730(h)(1).[21]
To establish a claim for FCA retaliation, a relator must show
that her employer took a retaliatory adverse employment action
against her and that her protected activity was the "but-for"
cause of that action.

A.  Relevant Factual Background

Relator's employment with AOC began in 2002.  Prior to
joining AOC, she had significant experience in medical billing
and coding.  Upon her arrival, she took steps to ensure
compliance with applicable regulations.  In 2005, AOC promoted
her to Chief Operating Officer.  Pl.'s Decl. ¶ 78, ECF No. 386-
3.[22]  When she discussed compliance issues with Elliott and AOC
physicians, they allegedly told her "not to worry about it."
*Id.* ¶ 55.  She also alleges that Dr. Shuler yelled at her for

---

[21] The Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.4,
contains a nearly identical retaliation provision.

[22] In their response to Relator's statement of material facts,
Defendants suggest that they intended to file a motion to strike
Relator's affidavit, but the only motion to strike Defendants filed
was a motion to strike the declarations of other witnesses (ECF No.
416).

questioning him about surgery coding; Dr. Tally screamed at her for refusing to let him unbundle procedures; and Dr. Tally yelled at her on two occasions (while Relator was supposed to be on medical leave) because the office was short-staffed. Regarding these instances, Relator points to no other evidence of what she told these doctors, what happened, or when it happened. Relator does claim that Dr. Tally threatened to fire her if she did not want to do things his way, but she did not say when this happened or what Dr. Tally was trying to get Relator to do.

Relator contends that the retaliation towards her escalated after she notified Defendants of concerns regarding dictations and signatures. She claims that in June 2014 a nurse approached Relator and stated that some doctors were "behind on dictations and signatures." Pl.'s Decl. ¶ 58. Relator approached Elliott about the situation, and he suggested having "nurses log in for the doctors and input their electronic signatures." *Id.* ¶ 59. During a June 18, 2014 meeting of AOC's board of directors, the issue was discussed, including the idea of having physician assistants, nurse practitioners, and medical assistants "log in and sign as the doctors." *Id.* ¶¶ 60-61. Relator told the physician board members that they "could get in trouble for fraud if they decided to implement the practice." *Id.* ¶ 60. The doctors nonetheless allegedly "decided to allow the illegal

signatures." *Id.* ¶ 62.   The meeting minutes state: "Signed dictation in a timely manner – voted to allow nurses or another clinical person to make sure dictations are signed for you." Pl.'s Resp. to Defs.' Mot. for Summ. J. – Retaliation Ex. 8, Board Minutes (June 18, 2014), ECF No. 391-7.[23]

Relator asserts that after the June 18 board meeting, the doctors repeatedly berated her.   She points to three episodes, all involving Dr. Michael Shuler.

- On July 8, 2014, Dr. Shuler asked his assistant to consult Relator about a coding policy change.   The assistant sent Relator an email, then Dr. Shuler followed up soon after that asking Relator to "get with Theresa and advise on how to code for these" procedures noting that the change "is not going to work" for him.   Pl.'s Resp. to Defs.' Mot. for Summ. J. – Retaliation Ex. 11, Email Chain (July 8, 2014), ECF No. 391-9.

- On July 10, 2014, Dr. Shuler left Relator a "loud and angry voicemail" about pricing for durable medical equipment.   Pl.'s Decl. ¶ 66.   According to Relator, Dr.

---

[23] There is no dispute that Medicare requires a physician's signature on certain medical documentation to authenticate the documents and the care provided by the physician.   When AOC's lawyer found out that doctors were giving nurses or physician assistants their access codes so they could sign off on charts for the doctors, the lawyer identified it as a "glaring" issue and told Elliott "to put a stop to it immediately."   Pl.'s Resp. to Defs.' Mot. for Summ. J. – Retaliation Ex. 9, Email from D. Mohan to R. Threlkeld (Aug. 7, 2014, 4:34 PM), ECF No. 391-8.

Shuler "was frustrated over prices and not being able to find the [price] list." *Id.* Relator later responded with an email to explain the situation; although Dr. Shuler responded to Relator's email, he did not apologize for the tone of his voicemail. *Id.*

♦ Later in July 2014, a physician named Dr. Manfredi asked Relator to schedule an uninsured patient with the hand team, and the patient was assigned to Dr. Shuler. After Dr. Shuler saw the patient, he went to Relator's office and yelled at her, saying that she should not be in charge of assigning patients and that he should not have had to see the uninsured patient. *Id.* ¶ 69. Relator said that Dr. Manfredi asked her to get the patient in with the hand team, and Dr. Shuler went to look for Dr. Manfredi. *Id.*

On Friday, July 25, 2014, Elliott called Relator into his office to discuss the uninsured patient referral issue. According to Elliott, Dr. Shuler had spoken with Dr. Manfredi, who did not remember telling Relator to refer the uninsured patient to the hand team. *Id.* ¶ 70. Elliott also told Relator that Dr. Shuler said that Relator was a liar who couldn't be trusted, although Elliott apologized for Dr. Shuler's actions. *Id.* Elliott stated that he would not speak to Dr. Shuler further about the issue or take any administrative action

against him because "the situation was not clear." *Id.* "At that point," Relator told Elliott that she "was done." *Id.* ¶ 71. She said that she "was done trying to keep them compliant and not being listened to." *Id.* She told Elliott that "they were committing fraud on so many levels with kickbacks, [S]tark, and false claims." *Id.* Elliott responded that Relator did not know the rules like she thought she did, and she did not know how to run a business. *Id.* Elliott asked if Relator planned to file a complaint, and Relator said that she was thinking about it. *Id.* Elliott also asked Relator "to reconsider and stay at the practice." *Id.* Relator declined and sent Elliott a written letter of resignation that day.

Under Relator's employment contract, Relator could terminate her employment "without cause" by giving AOC "sixty (60) days' advance written notice of termination." Defs.' Mot. for Summ. J. – Retaliation Ex. 11, Employment Agreement § 4(e), ECF No. 341-13. "Such termination shall become effective on the sixtieth (60th) day following the date of such notice." *Id.* On July 28, 2014, Elliott told the doctors that Relator was leaving, and Relator began a transition plan to be completed "over the next two months." Pl.'s Decl. ¶ 72. But on August 1, 2014, Elliott told Relator they were letting her go and that the doctors decided to restrict her access to confidential files because they were worried about what Relator might report or

take to use against them. *Id.* ¶¶ 72-73. Elliott told Relator that her last day would be August 6 and that she would be working from home until then. *Id.* ¶ 74. Elliott instructed Relator to pack up her office, which she did. *Id.* Then he walked Relator to the parking deck and carried her personal belongings to her car. *Id.* ¶ 75.

Relator went on a pre-scheduled vacation beginning August 8, 2014. After that, she started a job search. *Id.* ¶ 77. Relator asserts that several medical practices "showed some interest." *Id.* ¶ 77. According to Relator, once she provided her references, including AOC, the practices told Relator they were no longer interested. *Id.* One practice, the Longstreet Clinic, sent AOC a request for employment verification. Elliott responded, verified Relator's employment, and stated that Relator was eligible for rehire. Defs.' Mot. for Summ. J. – Retaliation Ex. 34, Employment Verification, ECF No. 341-36.

B.   Discussion

Relator contends that she was subjected to four adverse actions because of her efforts to stop FCA violations: (1) harassment, (2) constructive discharge, (3) failure to follow the 60-day notice provision in her contract, and (4) post-employment interference with potential employers.

### 1.   Harassment and Constructive Discharge

The FCA prohibits harassment and other discrimination "in the terms and conditions of employment" because of an employee's efforts to stop FCA violations.  31 U.S.C. § 3730(h)(1).  The Eleventh Circuit has not defined what constitutes "harassment" under the FCA.  The Fifth Circuit examined the issue and adopted the "materially adverse action" standard applicable in retaliation actions under Title VII of the Civil Rights Act of 1964.  *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 326 (5th Cir. 2016).  This standard requires that a retaliatory act be "materially adverse," meaning that "it well might have dissuaded a reasonable worker" from engaging in protected activity.  *Id.* (quoting *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 259-60 (5th Cir. 2014)).  This standard, of course, originated in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006), which Relator cites in her response brief as the applicable standard.  The Court finds the Fifth Circuit's rationale persuasive and concludes that for harassment to be actionable under the FCA, it must meet the "materially adverse action" standard.  A constructive discharge, which "occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces" her to quit her job, would certainly satisfy this standard.  *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261,

1268 (11th Cir. 2021).  But an adverse action would not have to
rise to the level of constructive discharge to meet the
materially adverse standard.

Relator failed to present any evidence from which a
reasonable jury could causally connect her complaints about
mistreatment prior to June 2014 to her efforts to stop FCA
violations.  She did point to evidence that, after she warned
the doctors at the June 18, 2014 board meeting that their plan
regarding signatures on medical documentation could be deemed
illegal fraud, she had three unpleasant encounters with Dr.
Shuler:  Dr. Shuler sent Relator an email stating that a coding
policy change would not work for him; he left Relator a loud and
angry voicemail about durable medical equipment pricing; and he
visited Relator's office and yelled at her after she assigned
him an uninsured patient.  When Relator complained to Elliott
about Dr. Shuler's conduct, Elliott declined to take any action
against Dr. Shuler.

Even if the Court assumed that Relator's protected FCA
activity prompted Dr. Shuler's alleged mistreatment of her, this
alleged mistreatment does not rise to the level of an adverse
employment action or constructive discharge.  As explained by
the Supreme Court in *Burlington Northern,* the employment laws do
"not set forth 'a general civility code for the American
workplace.'"  548 U.S. at 68 (quoting *Oncale v. Sundowner*

*Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  And thus there must be "*material* adversity" before the employment action is actionable.  *Id.* For example, "sporadic use of abusive language" and "simple lack of good manners" are not considered materially adverse for a reasonable employee.  *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  The Court can conceive of no reason why this same standard would not apply to the evaluation of FCA retaliation claims.  Here, Relator got one terse email and one angry voicemail from Dr. Shuler about two separate issues, then Dr. Shuler came to her office and yelled at her about a third issue.  While some may consider Dr. Shuler's conduct to have been rude, impatient, and insensitive, a reasonable jury would not be authorized to conclude that his alleged harassment rose to the level of an adverse employment action.  Accordingly, Defendants are entitled to summary judgment on Relator's claims that she was harassed and constructively discharged in retaliation for her protected activity.

### 2.   *Failure to Follow Contractual Termination Date*

In addition to her harassment and constructive discharge claims, Relator asserts that AOC retaliated by failing to honor its employment agreement with her.  The employment agreement provides that Relator's termination would not become effective until sixty days after her resignation unless the parties agreed

to a different date (which they didn't).  Instead, less than a week after Relator resigned—and less than a week after Relator told Elliott that she was thinking about filing an FCA complaint—AOC arguably terminated Relator's employment, to be effective almost seven weeks before the contractual termination date.  It is not clear from the present record whether AOC paid Relator for the remaining seven weeks left on her contract.  If it did not, a reasonable juror could conclude that AOC subjected Relator to a materially adverse action because of FCA protected activity.  Thus, AOC is not entitled to summary judgment on Relator's retaliation claim based on the acceleration of her termination date.  Relator did not present evidence that any of the other Defendants were her "employer" for purposes of an FCA retaliation claim, so the other Defendants are entitled to summary judgment on this claim.

   3.   *Post-Employment Conduct*

Lastly, Relator asserts that after her departure, Defendants interfered with her job search.  Pretermitting whether post-employment conduct is actionable for purposes of an FCA retaliation claim, Relator did not point to any evidence of interference.  She speculates that someone at AOC must have given her a negative reference because several prospective employers told Relator they were not interested in offering her a job after they received her references.  Relator, however,

only pointed to one potential employer, Longstreet Clinic, who even contacted AOC.  And AOC produced uncontradicted evidence that in response to Longstreet Clinic's inquiry, it verified Relator's employment and told Longstreet she was eligible for rehire.  Elliott and the Defendant doctors testified that they did not give Relator a negative job reference or tell anyone not to hire Relator.  Elliott Decl. ¶ 17; Johnson Decl. ¶ 39, ECF No. 341-17; Katz Decl. ¶ 37, ECF No. 341-16; Mahoney Decl. ¶ 46, ECF No. 341-35; Shuler Decl. ¶ 37, ECF No. 341-18; Smith Decl. ¶ 40, ECF No. 341-19; Tally Decl. ¶ 37, ECF No. 341-20.  Relator has pointed to no evidence to create a genuine fact dispute on this issue.  Thus, Defendants are entitled to summary judgment on Relator's retaliation claim arising from post-departure conduct.

## CONCLUSION

As discussed above, the Court **grants** summary judgment as to the following claims:

♦ Claim # 1 (Physician Partner Bonuses) against all Defendants.

♦ Claim # 2 (Physician Buy-Ins to Athens Orthopedic) against all Defendants.

♦ Claim # 4 (Distributions from ASC) against all Defendants.

♦ Claim # 5 (Physician Buy-Ins to ASC) against all Defendants.

♦ Claim # 6 (Discounts) as to alleged discounts for Arthrex anchors – Claim # 6(a); Linvatec towers – Claim # 6(b); Mitek VAPR unit - Claim # 6(d); Monovisc - Claim # 6(e); Cosmed equipment – Claim # 6(f); Southern Orthopaedics plates - Claim

# 6(g); United Orthopedics kits - Claim # 6(h); SBI plates - Claim # 6(i).

- ◆ Claim # 7 (Modifier 25) against all Defendants except AOC.

- ◆ Claim #8 (Modifier 59) against all Defendants except AOC.

- ◆ Claim # 9 (E/M Level) against all Defendants except AOC.

- ◆ Claim # 10 (Viscosupplements – QP Medical) against all Defendants except AOC.

- ◆ Claim # 11 (Viscosupplements – Wicklow) against all Defendants except AOC.

- ◆ Claim # 16(c) (Imaging – Anti-Markup Rule) against all Defendants except AOC.

- ◆ Claim # 17 (DMEPOS Number) against all Defendants except AOC.

- ◆ Claim # 18 (Orthotics by Unlicensed Provider) against all Defendants except AOC, Dr. Johnson, and Dr. Mahoney.

- ◆ Claim # 20 (Research, Royalties, and Consulting Agreements from Vendors) against all Defendants.

- ◆ Claim # 22 (Kickbacks - Distributions from LASC) against all Defendants.

- ◆ Claim # 23 (Kickbacks - Physician Buy-Ins to LASC) against all Defendants.

- ◆ Claim # 24 (Kickbacks - Exos Braces) against All Defendants.

- ◆ Claim # 27 (Back Billing Durable Medical Equipment) as to all Defendants.

- ◆ Claim # 28 (Kickbacks – Free Equipment – Crosslink implants, Stryker drill, Smith & Nephew generator) as to all Defendants.

- ◆ Claim # 55 (Retaliation) as to all Defendants on harassment, constructive discharge, and post-termination claims and as to all Defendants except AOC on the shortened termination date claim.

**The following claims remain pending for trial:**

♦ Claim # 3(a) (Kickbacks - Employee Physician Bonuses) and Claim # 3(b) (Stark - Employee Physician Bonuses) against all Defendants. Defendants shall be permitted to raise an advice-of-counsel defense as to these claims.

♦ Claim # 6(c) (Kickbacks – Mitek anchors) against all Defendants. Defendants shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 7 (Modifier 25) against AOC only. AOC shall <u>not</u> be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 8 (Modifier 59) against AOC only. AOC shall <u>not</u> be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 9 (E/M Level) against AOC only. AOC shall <u>not</u> be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 10 (Viscosupplements – QP Medical) against AOC only. AOC shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 11 (Viscosupplements – Wicklow) against AOC. AOC shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 12 (Kickbacks – Atlanta Prosthetics and Orthotics) against all Defendants. Defendants shall <u>not</u> be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 13 (Kickbacks - AOCs & Prosthetics) against all Defendants. Defendants shall <u>not</u> be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 14 (Kickbacks – HRJ Custom Orthotics) against all Defendants. Defendants shall <u>not</u> be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 15 (Kickbacks – Providence Orthopedics) against all Defendants. Defendants shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 16(a) (Kickbacks - External Radiology Referrals) and Claim # 16(b) (Stark – Radiology Referrals) against all

Defendants; Claim # 16(c) (Anti-Markup Rule – Imaging) against AOC only.  Defendants shall be permitted to raise an advice-of-counsel defense as to Claim # 16(a) and # 16(b) but not # 16(c).

♦ Claim # 17 (DMEPOS Number) against AOC only.  AOC shall <u>not</u> be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 18 (Orthotics by Unlicensed Provider) against AOC, Dr. Johnson, and Dr. Mahoney.  Defendants shall <u>not</u> be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 19 (Kickbacks - Employee Physician Bonuses) against all Defendants.  Defendants shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 21 (Kickbacks - Physician Assistant Bonuses) against AOC only.  AOC shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 25 (Stark - Partner Physician Bonuses) against all Defendants.  Defendants shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 29 (Stark - Referrals to PT/OT) against all Defendants.  Defendants shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 31 (Stark - Referrals for DME) against all Defendants.  Defendants shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 35 (Stark - Referrals for Orthotics) against all Defendants.  Defendants shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 36 (Stark - Referrals for Imaging) against all Defendants.  Defendants shall be permitted to raise an advice-of-counsel defense as to this claim.

♦ Claim # 55 (Retaliation) against AOC on the shortened termination date claim.

Defendants' motion to exclude the testimony of Harold Pellerite (ECF No. 349) is granted to the extent set forth above.

The Court has previously issued an order specially setting this case for trial, scheduling the final pretrial conference, and setting deadlines for filings related to the final pretrial conference and trial. The directives in that order remain unchanged. This case will be tried starting October 31, 2022 unless the parties otherwise resolve it before then. The Court will not be receptive to any motion for continuance based upon representations that the parties would like to try to mediate the case or otherwise need more time to determine whether it can be resolved without a trial. The parties have plenty of time between now and the date of trial to resolve this matter if they wish to do so. Preparing for trial while also exploring settlement is not unusual.

IT IS SO ORDERED, this 19th day of July, 2022.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA