IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

UNITED STATES OF AMERICA, and    *
STATE OF GEORGIA, *ex rel.*
REBECCA HOCKADAY,    *

     Plaintiff-Relator,    *
vs.
                 *      CASE NO. 3:15-CV-122 (CDL)

ATHENS ORTHOPEDIC CLINIC, P.A.,
*et al.*,    *

     Defendants.    *

_____

O R D E R

At the final pretrial conference held on September 9, 2022, the Court made several oral rulings on the parties' various motions to exclude expert testimony and other motions in limine. This order memorializes in writing those rulings and includes rulings on the motions which the Court took under advisement.

**I.   Pretrial Conference Rulings on Expert Testimony**

The Court ruled from the bench on motions to exclude expert testimony from several witnesses. The Court found that S. Lynne Stokes, Harold Haller, Georgann Edford, Jim Carr, and G. Don Barbo are qualified, that their specialized knowledge and experience would help the jury understand the evidence and/or to determine a fact in issue, that their testimony is based on sufficient facts and data, that their testimony is the product of reliable principles and methods, and that they have reliably

applied those principles and methods to the facts of this case. The Court thus denied the following motions to exclude expert testimony: Defendants' Motion to Exclude Testimony of S. Lynne Stokes (ECF No. 448) (with the caveat that Relator must prove the other elements of her claim, including falsity and scienter, through other evidence, *i.e.*, Stokes's testimony standing alone does not establish these elements); Defendants' Motion to Exclude Testimony of Georgann Edford (ECF No. 449) (with the caveat that she may not opine as to legal conclusions or the parties' subjective intent); Defendants' Motion to Exclude Testimony of G. Don Barbo (ECF No. 447); Relator's Motion to Exclude Testimony of Harold Haller (ECF No. 443 & 488) (with the caveat that his testimony must be restricted to his area of expertise); and Relator's Motion to Exclude Testimony of Jim Carr (ECF No. 446).

## II.  Pretrial Conference Rulings on Motions in Limine

The Court granted in part, denied in part, and deferred in part both Relator's omnibus motion in limine (ECF No. 442) and Defendants' omnibus motion in limine (ECF No. 451).  Defendants withdrew their motion in limine # 10.

The Court granted the following motions in limine:

- ♦ Relator's Motion # 1 – Granted to exclude treble damages, statutory penalties, attorney's fees.

♦ Relator's Motion # 4 – Granted to exclude evidence or argument that Defendants have not been criminally prosecuted.

♦ Relator's Motion # 5 – Granted to exclude evidence of claims that will not be permitted at trial/the fact that summary judgment was granted as to some claims.

♦ Relator's Motion # 7 – Granted to exclude "comparing this lawsuit to games of chance or suggesting external public policy issues should or can be considered by the jury."

♦ Relator's Motion # 8 – Granted to exclude argument or evidence of "any anticipated impact of litigation."

♦ Relator's Motion # 11 – Granted to exclude evidence regarding settlement demands, offers, negotiations, or mediation for a purpose not permitted by Federal Rule of Evidence 408.

♦ Defendants' Motion # 3 – Granted to exclude evidence of specific instances of patient harm.

♦ Defendants' Motion # 11 – Granted to exclude reference to discovery disputes between the parties.

The Court Denied the following motions in limine:

♦ Relator's Motion # 12 – Denied motion to exclude Jim Carr's testimony as untimely disclosed.

♦ Defendants' Motion # 8 – Denied motion to exclude evidence that Relator is representing the United States.

The Court deferred ruling on several issues presented by the parties in their omnibus motions in limine until the time of trial when the Court has an opportunity to consider the evidence in the context of the trial.  Counsel is directed to make any appropriate objections at the time the evidence is presented at trial.  The deferred motions include:

- Relator's Motion # 1 – Deferred as to evidence of Relator's potential share of recovery.

- Relator's Motion # 2 – Deferred to the extent that Relator can be questioned about her motivation in filing this action.

- Relator's Motion # 6 – Deferred as to evidence of Relator Hockaday's EEOC claim.

- Relator's Motion # 9 – Deferred as to evidence or argument regarding Defendants' character and quality of patient care.

- Relator's Motion # 10 – Deferred as to evidence of "specific patients or patient groups Defendants have treated or currently treat."

- Defendants' Motion # 1 – Deferred as to evidence relevant to claims that have been dismissed (either by voluntary dismissal or on summary judgment).

- Defendants' Motion # 2 – Deferred as to evidence of third-party private insurers' audits, investigations, billing guidelines, or reimbursements, with the caveat that there must be substantial similarity.

- Defendants' Motion # 4 – Deferred as to evidence of physician earnings.

- Defendants' Motion # 6 – Deferred as to evidence of physicians' personal behavior or behavior towards Relator.

- Defendants' Motion # 9 – Deferred as to evidence or argument that billing mistakes and lack of documentation supports an FCA claim.

## III. Defendants' Motion to Exclude the Expert Testimony of Bruce Seaman (ECF No. 450)

The Court deferred ruling on Defendants' motion to exclude the testimony of Bruce Seaman until it could hold a *Daubert*

hearing at which Dr. Seaman would be subjected to examination. That hearing was held on September 15, 2022.

Dr. Seaman is an economist. He has extensive experience in analyzing economic data, including data in the area that is the subject of this litigation. His training and experience includes preparing economic models that are based on statistical analyses and extrapolation of data to project with reasonable certainty the value of missing data. In this case, Dr. Seaman was retained to review available data regarding claims submitted by Defendants to the Government for payment in an effort to estimate with reasonable certainty the government-payor claims that Defendants likely submitted to the Government for the years 2006 to 2012, which were the years for which Defendants had preserved no data regarding Government-payor claims.

The Court finds that Dr. Seaman is sufficiently qualified by his training and experience to provide this type of analysis. He holds a Ph.D. in economics from the University of Chicago. He has been an economics professor at Georgia State University since 1978, has authored numerous publications on various economics topics, and provided economic analyses—including damages analyses—in numerous court cases.

The Court further finds that Dr. Seaman's testimony is based on sufficient data, that his opinions are the product of reliable principles and methods, and that he reliably applied

those principles and methods in his analysis in this case.  Dr.
Seaman's job here was to determine how to use the available data
to project the claims for the years where only Medicare Part B
data was available and data for the rest of Government-payor
claims was missing.  He considered claims data that had been
captured by Dr. Matthew Mercurio.  Based on the correspondence
Dr. Seaman reviewed, he was comfortable that Dr. Mercurio's data
was processed in a way such that it was the type of data
economists typically rely on in performing the type of analysis
Dr. Seaman did here.  Dr. Seaman derived a simple average of the
ratios across all years, then determined the variance, standard
deviation, and coefficient of variation.  Based on the results,
Dr. Seaman determined that the use of mean data was justified to
project the missing claims data, and he applied an adjustment
factor to the relevant data to project the claims amounts for
the missing data years.

The Court further finds that Dr. Seaman's testimony would
be helpful to the jury.  The issue of projecting missing claims
data is a complicated issue that is beyond the understanding of
an average layperson.  This issue can best be understood with
the help of an expert.

Based on the foregoing, Defendants' Motion to Exclude the
Testimony of Bruce Seaman (ECF No. 450) is denied.

**IV.  Relator's Motion in Limine to Exclude Evidence of the Government's Decision Not to Intervene (ECF No. 442, # 3)**

The Government's decision not to intervene in this action is not admissible because it is not relevant, and if it had some probative value, that probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues.

The Court finds Defendants' argument to the contrary unpersuasive.  Defendants argue that the Government's decision not to intervene is probative of whether their alleged violations of the law were material.  For Relator to prevail, she must prove, among other things, that the false claims allegedly made here were material to the Government's decision to pay the claims.  Therefore, Defendants maintain that if the Government knew about Defendants' alleged unlawful practices and nevertheless paid the claims, then the Government must not have considered the alleged unlawful practices to be material. Defendants primarily rely upon *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089 (11th Cir. 2020).  Although Defendants' argument may have some superficial appeal, it is not adjusted to the record in this case.  The mere fact that the Government has investigated Relator's claims and chosen not to intervene is not probative of whether the false claims here were material.  The Government can refuse to intervene for any number of reasons,

some of which may be wholly unrelated to the merits of the case. Here, the Government was presented with *allegations* of unlawful conduct, and it conducted an investigation to determine whether it would intervene.  It decided not to intervene.  There is no indication that this non-intervention decision was based on a finding that the Defendants had not engaged in conduct that would subject them to liability under the False Claims Act, including whether the Government believed the alleged false claims were material.

Defendants' counsel misunderstands *Ruckh*.  *Ruckh* does not support the broad proposition that decisions not to intervene by the Government are probative of a lack of materiality.  Instead, *Ruckh* held that "the district court correctly granted the defendants' motion for judgment as a matter of law as to the alleged false Medicaid claims" because "no jury could have reasonably concluded that the defendants defrauded Medicaid" based on the facts in the case.  *Ruckh*, 963 F.3d 1108.  The *Ruckh* court noted that if the Government pays a claim despite *actual knowledge* that certain requirements were violated, that is evidence that the requirements are not material.  *Id.* at 1109.  Likewise, if the Government regularly pays a type of claim despite *actual knowledge* that certain requirements are not met and has signaled no change in its position, that is evidence that the requirements are not material.  *Id.*  The relator in

*Ruckh* did not demonstrate materiality because there was "no evidence" that the state refused reimbursement after the defendant self-reported deficiencies in its compliance with certain regulations—thus putting the state on *actual notice* of violations—and there was no other evidence that the state enforced the type of violation at issue. *Id.* Thus, the state had actual knowledge of violations and took no action, which suggests that the requirements were not material.

Here, there is no evidence that the Government actually determined that Defendants engaged in unlawful conduct but continued to pay claims that arose from that unlawful conduct—nothing to suggest that the Government's knowledge of *allegations* should be considered equivalent to knowledge of actual *violations*. Counsel's arguments are based on sheer speculation. Relator's motion to exclude evidence regarding the Government's decision not to intervene is granted.[1]

---

[1] This ruling does not exclude evidence from a source other than the Government's attorneys who investigated the claims and participated in the non-intervention decision. If there is evidence that the Government knew that Defendants were engaged in the practices which form the basis of Relator's current action yet paid those claims despite actual knowledge of those practices, the Court may reconsider this decision. If such evidence exists, Defendants should present it to the Court via a motion for reconsideration by October 7, 2022. Today's ruling simply directs that evidence of the decision not to intervene, including the evaluation of that decision by Government counsel, shall not be admissible.

V.   **Defendants' Motion to Exclude Evidence of Spoliation (ECF No. 451 # 7) and Relator's Motion for Spoliation Sanctions (ECF No. 500)[2]**

Relator contends that Defendants improperly destroyed documents and electronically stored information. Defendants seek to exclude evidence or argument regarding spoliation. In response, Relator filed a motion for spoliation sanctions based on Athens Orthopedic Clinic's failure to preserve the following information: (1) electronically stored data from Athens Ambulatory Surgery Center's Vision database; (2) electronically stored data from AOC's Allscripts database; (3) electronically stored audio recordings of AOC board meetings, (4) desktop computers and external hard drives; and (4) hard copy documents like payroll records and profit sharing documents. As discussed below, Defendants' motion to exclude evidence of spoliation (ECF No. 451 # 7) is granted, and Relator's motion for spoliation sanctions (ECF No. 500) is denied.

Spoliation occurs when a party, in bad faith, fails to preserve evidence and the failure prejudices another party. In determining whether to issue sanctions for spoliation, the Court considers: "(1) whether the party seeking sanctions was

_____

[2] This is the first time the Court has been asked to decide whether spoliation sanctions are warranted. The parties did have discovery disputes regarding potential spoliation, but in October 2021 the Court denied Relator's most recent motion to compel additional spoliation evidence because AOC represented that it produced all the non-privileged, responsive documents it had on the topic, and Relator had been permitted to take depositions on the topic. Order 25 (Oct. 27, 2021), ECF No. 336.

prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed." *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018); *accord* Fed. R. Civ. P. 37(e) ("If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court [should determine whether the opposing party suffered prejudice and order measures] no greater than necessary to cure the prejudice."). In determining whether a spoliating party acted in bad faith, the Court weighs "the degree of the spoliator's culpability against the prejudice to the opposing party." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 946 (11th Cir. 2005); *accord* Fed. R. Civ. P. 37(e) (stating that if a court finds that "the party acted with the intent to deprive another party of the information's use in the litigation," the Court may "presume that the lost information was unfavorable to the party" or "instruct the jury that it may or must presume the information was unfavorable to the party").

If there is no duty to preserve the evidence at the time of its destruction, then the destruction is not spoliation. Thus, the first question for the Court is when AOC's duty to preserve evidence arose. After the Court answers that question, the Court will address each type of allegedly spoliated evidence.

A.   When Did the Duty to Preserve Arise?

The duty to preserve evidence "arises when litigation is 'pending or reasonably foreseeable' at the time of the alleged spoliation." *Alabama Aircraft Indus., Inc. v. Boeing Co.*, No. 20-11141, 2022 WL 433457, at *14 (11th Cir. Feb. 14, 2022) (per curiam) (quoting *Oil Equip. Co. v. Mod. Welding Co.*, 661 F. App'x 646, 652 (11th Cir. 2016) (per curiam)). In *Alabama Aircraft Industries*, for example, one party to a contract predicted an "ugly, lengthy legal battle" if it terminated its agreement with the other party, and when it terminated the contract the other party responded that the termination "violated the agreement . . . and we're likely going to do something about it." *Id.* By that point, litigation was reasonably foreseeable, and it remained reasonably foreseeable when the evidence in question was destroyed. Similarly, in *Oil Equipment Co.*, the buyer of an underground storage tank, through its lawyer, demanded a replacement or a refund and all costs from the manufacturer because it argued that the tank was defective. The manufacturer responded that the problems were

caused by improper installation, and it asked for written notice prior to exhumation of the tank.  At that time, litigation was reasonably foreseeable, so the buyer had a duty to preserve the tank.  *Oil Equip. Co.*, 661 F. App'x at 652.

Here, Relator contends that Athens Orthopedic Clinic ("AOC") should have been on notice of potential False Claims Act ("FCA") litigation in July 2014, when Relator told AOC's CEO Kayo Elliott that she was "done trying to keep [AOC] compliant and not being listened to," Elliott asked Relator if she planned to file a complaint, and she replied that she was "honestly thinking about it."  Hockaday Decl. ¶ 71, ECF No. 394-10.  After Elliott told the doctors that Relator was leaving the practice, the doctors decided that she should no longer have access to confidential files because they were worried about what she might report and what materials she might take to use against them.  *Id.* ¶ 73.  Shortly after that, AOC's lawyer noted that Relator had resigned and "made some noise about possibly suing AOC in connection with her resignation."  Mot. for Spoliation Sanctions Ex. C, Email from D. Mohan to R. Threlkeld (Aug. 7, 2014, 4:34 PM), ECF No. 500-3.  The lawyer did note that AOC looked "pretty clean" except for a recently implemented practice of having nurses sign off on patient charts, which the lawyer told Elliott to stop immediately.  *Id.*

Two weeks after Relator's employment ended, Relator's lawyer sent a demand letter to Elliott, stating that Relator planned to file a charge of discrimination with the Equal Employment Opportunity Commission asserting claims of sex discrimination, disability discrimination, retaliation, and hostile work environment. Defs.' Mot. for Summ. J. on Retaliation Claims Ex. 28, Letter from E. Buckley to K. Elliott (Aug. 20, 2014), ECF No. 341-30. The letter did not mention false claims or a whistleblower action. Relator later filed a charge of discrimination with the EEOC, and Relator was issued a right-to-sue letter on May 13, 2015. Defs.' Mot. for Summ. J. on Retaliation Claims Ex. 31, Dismissal & Notice of Rights (May 13, 2015), ECF No. 341-33. Until ninety days passed following issuance of the right-to-sue letter, AOC suspected that Relator may file an employment discrimination action against it.

Relator filed this FCA *qui tam* action under seal on December 21, 2015. There is no evidence that anyone at AOC was made aware of the action at the time.[3] On May 26, 2016, the Office of Inspector General for the Department of Health and Human Services served AOC with a subpoena regarding its

---

[3] Relator contends that AOC knew about the possibility of a *qui tam* action because its compliance officer exchanged text messages with Relator late one evening May 2015, in which they communicated about alleged violations and the compliance officer joked that she would "make sure that all [her] files make it to [her] house a few at a time. Roflmao." Relator Resp. to Mot. for Summ. J. on Retaliation Claim Ex. 19 at RH001609, Text Exchange (May 28, 2015), ECF No. 386-8.

investigation of Relator's allegations.  AOC represents that its
attorneys issued a litigation hold letter on June 3, 2016.

Based on this record, the Court finds that even if AOC was
aware of a potential FCA *qui tam* action shortly after Relator's
employment was terminated in 2014, she did not point to any
evidence or authority that AOC should have remained on alert for
a potential FCA *qui tam* action from Relator for nearly two
years, from late July 2014 to late May 2016.  In 2014, Relator
told Elliott that she was thinking about filing a complaint,
then her lawyer promptly sent a demand letter regarding
Relator's employment discrimination claims and Relator later
filed an EEOC charge.  While those facts certainly put AOC on
notice that Relator might bring an employment discrimination
action against AOC, they did not put AOC notice of a potential
FCA *qui tam* action.  Accordingly, the Court concludes that AOC's
duty to preserve evidence related to the FCA action arose on May
26, 2016, when AOC was served with the Office of Inspector
General subpoena.

> B.   Vision Database (Electronically Stored)

Before 2010, the Athens Ambulatory Surgery Center ("ASC")
used a clinical management software program called Vision.  The
ASC transitioned to a new software called Amkai in 2010.  The
pre-2010 billing and claims data was not transferred from the
Vision server to the Amkai server.  AOC stated in its verified

interrogatory responses that the data on the ASC Vision server was deleted and the server was recycled by a vendor within "2 or 3 years after the Athens ASC began using Amkai, and well before AOC became aware of the Subpoena." Revised Resps. & Objs. To Relator's Am. & Suppl. 3d Interrogs. 17-19, ECF No. 257-1 ("Rog. Resps."). According to a 2015 email exchange between AOC employees and the information technology vendor, though, the Vision server remained active until it was shut down in June 2015. Mot. to Compel Spoliation Discovery Ex. B, Email from P. Cofer to J. Oblein, *et al.* (June 1, 2015, 3:32 PM), ECF No. 238-2. The vendor stated that the server "will be available afterwards should you need something important off of it." Thus, it appears that interrogatory response that the server was wiped and recycled two or three years after the Amkai transition was wrong. Relator, who was permitted to depose AOC's IT vendor, did not point to any evidence that the Vision data was actually maintained after June of 2015 or that it still existed when AOC became aware of the OIG subpoena in May of 2016. Thus, the present record does not establish that ASC destroyed the Vision data despite a duty to preserve it. Relator is not entitled to spoliation sanctions with regard to the Vision data, and she shall not be permitted to argue that AOC or ASC intentionally destroyed it. This ruling shall not prevent Relator from stating that the pre-2010 Vision data is "missing"

if it is part of the missing data that Dr. Seaman's analysis addresses.

### C.   Allscripts Database (Electronically Stored)

Before 2012, AOC used the Allscripts system as its practice management system.  In 2012, AOC switched to Caretracker as its practice management system.  AOC did not transfer any data from Allscripts to Caretracker except for "patient demographic data." Rog. Resps. 17-18.  Thus, claims data for the patients was not transferred to Caretracker.[4]   AOC stated in its verified interrogatory responses that the AOC Allscripts server was wiped clean and recycled by a vendor no later than 2015.  *Id.* Pointing to the email exchange between AOC employees and the IT vendor regarding the Vision server, Relator speculates that the Allscripts server remained operational despite the interrogatory response to the contrary.  Relator, who was permitted to depose AOC's IT vendor, did not point to any evidence that the Allscripts data was actually maintained after June of 2015 or that it still existed after AOC became aware of the OIG subpoena in 2016.  Thus, the present record does not establish that AOC destroyed the Allscripts data despite a duty to preserve it. Relator is not entitled to spoliation sanctions with regard to the Allscripts data, and she shall not be permitted to argue

---

[4] According to Defendants, patient electronic health records are kept in a separate database called SRS.  Defendants represent that SRS data was retained and produced to Relator.

17

that AOC intentionally destroyed it.   This ruling shall not
prevent Relator from stating that the pre-2012 Allscripts data
is "missing" if it is part of the missing data that Dr. Seaman's
analysis addresses.

D.   Audio Recordings (Electronically Stored)

Beginning in 2015, AOC had a practice of making digital
audio recordings of board meetings; the recordings were
maintained until after the minutes were documented, then the
recordings were deleted.  C. Cofer Dep. 17:19-18:8, ECF No. 500-
2.  Under this practice, the recordings made between June 2016
and August 2018 were not preserved after the board meeting
minutes were finalized because the person responsible for the
compiling the minutes did not realize that the recordings should
be preserved.  In September 2018, AOC started saving electronic
copies of the recordings, although Elliott "accidentally"
deleted the December 2018 recording when he played back the
recording to prepare the minutes.  *Id.* at 71:4-14.

Even though AOC reasonably anticipated litigation after it
received the OIG subpoena in May 2016, spoliation sanctions
based on the deletion of the recordings would only be
appropriate if AOC acted in bad faith *and* the practical
importance of the evidence was more than minimal.  *See Tesoriero
v. Carnival Corp.*, 965 F.3d 1170, 1183–84 (11th Cir. 2020)
("[E]ven if bad faith were shown, the court's decision not to

impose sanctions would be appropriate if 'the practical importance of the evidence' was minimal." (quoting *Flury*, 427 F.3d at 945)). Here, Relator did not explain why the recordings are crucial to her case given that detailed written meeting minutes were prepared—written meeting minutes that Relator relied on at the summary judgment stage to show that the AOC partner doctors voted to take several specific actions. In her present motion, Relator did not explain what additional, crucial evidence might be captured in the recordings that was not included in the written minutes. She did not point out discrepancies between the minutes and the recordings that were produced. She also did not point to any specific minutes that addressed an issue incompletely such that the unsaved recording was the only way to understand what happened in the meeting. Thus, the practical importance of the missing audio recordings is minimal, and Relator has not demonstrated that she is prejudiced by their deletion. The Court thus declines to impose spoliation sanctions based on the deletion of the audio recordings.

> E.   Desktop Computers and External Hard Drives (Electronically Stored)

In addition to the specific electronically stored information discussed above, Relator seeks spoliation sanctions based on AOC's failure to preserve electronically stored

information that was saved only to desktop computers or external hard drives, and not AOC's network.  Relator points out that AOC's IT vendor did not take any steps to preserve files on individual workstations or removable storage because everything important is supposed to be saved to the AOC network.  P. Cofer Dep. 87:4-21, ECF No. 500-5.  Relator conjectures that some data may have been improperly saved to an individual workstation or removable storage instead of the network, but she did not point to any *evidence* on this point, such as evidence that specific AOC partners or staff members admitted to saving documents only to off-network folders.  Without such evidence, it would be sheer speculation to conclude that Relator is prejudiced by AOC's failure to preserve individual workstations and removable media.  Sanctions are not appropriate on this issue.

    F.   Hard Copy Documents (Non-Electronic Evidence)

    Finally, Relator contends that spoliation sanctions should be imposed because AOC shredded documents even after it received the OIG subpoena in 2016.  AOC uses a shredding vendor to shred hard copy paper documents.  After AOC received the OIG subpoena, it directed the vendor to stop picking up and shredding documents.  According to AOC, the documents "all were hard copies of documents that were stored on or could be generated by AOC's computer system."  Rog. Resps. 7-8.  The documents were stored in an offsite facility until September 2016, when Elliott

20

authorized the vendor to resume the shredding.  In authorizing the shredding, Elliott stated, "The rule is if something is shredded it must be in a computer somewhere.  My expectation is that most or all documents that are shredded are either printed out from a computer or scanned in before being shred."  Defs.' Resp. to Pl.'s Mot. for Spoliation Sanctions Ex. 1, Email from K. Elliott to AOC (Sept. 2, 2016, 8:53 AM), ECF No. 503-1. Relator did not point to any evidence to dispute that the 2016 shred only included documents that were available elsewhere. Accordingly, she did not demonstrate that she was prejudiced by the destruction of these duplicate documents or that AOC acted in bad faith when it shredded them.  Sanctions are not warranted.

Relator also argues that spoliation sanctions should be imposed based on AOC's 2018 destruction of hard copy documents that had been saved pursuant to the litigation hold triggered by the OIG subpoena.  It is undisputed that Elliott learned on June 5, 2018 that the OIG investigation had been closed.  Elliott informed the AOC staff of this development that day and instructed them that AOC could return to business as usual, which the chief financial officer took to mean that the documents held pursuant to the litigation hold could be shredded as they otherwise would have been but for the litigation hold. Rog. Resps. 8.  She arranged for the shredding vendor to destroy

certain pre-2012 documents, including accounts payable records for 2008-2011, payroll records for January 2009 to December 2011, profit sharing documents for 2006 to 2010, and miscellaneous reports for 2004 to 2006. *Id.* at 8-9. Relator did explain how these categories of documents are crucial to her case considering the other evidence that was produced during discovery, such as AOC's general ledger and financial reports.

On the afternoon of June 13, 2018, the Court entered an order unsealing Relator's complaint and ordering that the complaint be served on Defendants. Although some Defendants were aware of this action in early September 2018 because they consented to an extension of Relator's service deadline, it is not clear from the present record when Defendants became aware of Relator's *qui tam* action. Relator did not point to any evidence that the June 2018 document shredding happened *after* Defendants became aware of Relator's *qui tam* action. Accordingly, even if Relator had demonstrated that she was prejudiced by the destruction of the documents in June 2018, she did not show that AOC acted in bad faith when it shredded them. Sanctions are not appropriate on this issue.

G.   Summary

For the reasons set forth above, the Court finds that spoliation sanctions are not appropriate based on any of the grounds Relator raised in her motion. The Court reiterates that

Relator shall not be prohibited from stating that certain data from the Vision and Allscripts databases is "missing" or was "not preserved." It is somewhat perplexing that AOC failed to preserve the data given its IT vendor's assurance that the servers would be warehoused and started up should AOC need the data. The present record, though, does not establish that AOC destroyed the data despite a duty to preserve it. Thus, although spoliation sanctions are not warranted for AOC's failure to preserve the Vision and Allscripts data, the Court finds that the totality of the circumstances merit allowing Dr. Mercuiro to offer opinion testimony regarding his database management analysis. The Court previously concluded that Dr. Mercurio should be permitted to offer fact testimony at trial. To avoid the parties quibbling at trial about whether Dr. Mercurio's testimony is "fact" or "opinion," the Court now rules that Dr. Mercurio shall be permitted to offer opinion testimony. The Court finds that this ruling will not prejudice Defendants, who have been on notice for at least a year that Dr. Mercurio performed the data management analysis and have been given leave to depose Dr. Mercurio before trial.

**VI. Defendants' Motion to Exclude Testimony Regarding Relator's Physical/Psychological/Medical Condition (ECF No. 451 # 5)**

Relator seeks emotional distress damages on her FCA retaliation claim. Thus, Relator intends to introduce evidence

of her underlying medical condition, including her cancer diagnosis, to show how the distress from the alleged retaliation affected her. Defendants argue that the recovery of emotional distress damages is not permitted for FCA retaliation claims. Relator, relying upon the statutory text, argues that such damages are recoverable if they are necessary to make a relator whole.

The relevant damages provision in the FCA provides that an employee who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" because of her lawful acts to stop violations of the False Claims Act is "entitled to all relief necessary to make that employee . . . whole." 31 U.S.C. § 3730(h)(1). Relief under this provision includes "compensation for any special damages sustained as a result of the discrimination." *Id.* § 3730(h)(2). Thus, the appellate courts that have examined the issue have concluded that emotional distress damages caused by an employer's retaliatory conduct are permitted under § 3730(h). *Hammond v. Northland Counseling Ctr., Inc.*, 218 F.3d 886, 893 (8th Cir. 2000); *Neal v. Honeywell, Inc.*, 191 F.3d 827, 832 (7th Cir. 1999); *see also Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 672 (4th Cir. 2015) ("Every federal circuit court to have

addressed the issue has concluded that the False Claims Act 'affords noneconomic compensatory damages.'").

Defendants did not present the Court with any authority that emotional distress damages are not recoverable under § 3730(h). The Court will permit evidence on such damages, including evidence regarding Relator's underlying condition. Defendants' motion to exclude such evidence is denied.

CONCLUSION

This order addresses the outstanding issues from the pretrial conference. The Court will address the recently filed motions in limine (ECF Nos. 505 & 506) separately. Relator is reminded that her response to Defendants' "peculiar issues of law" statement is due no later than October 21, 2022.

IT IS SO ORDERED, this 29th day of September, 2022.

s/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA